**Daniel SCHLEIFER, et al., Plaintiffs,**

v.

**CITY OF CHARLOTTESVILLE, Defendant.**

**Civil Action No. 97–0021–C.**

United States District Court, W.D. Virginia, Charlottesville Division.

May 20, 1997.

**824**

Deborah Chasen Wyatt, Wyatt & Carter, Charlottesville, VA, Mary Catherine Bauer, ACLU of Virginia Foundation, Richmond, VA, for Plaintiffs.

W. Clyde Gouldman, III, Deputy City Attorney, Charlottesville, VA, Lisa Robertson Kelley, City Attorney's Office, Charlottesville, VA, for Defendant.

## MEMORANDUM OPINION

MICHAEL, District Judge.

On April 30, 1997, this court issued an Order and accompanying Memorandum Opinion in which it denied the request for preliminary injunctive relief made by Plaintiffs Daniel Schleifer, William McCutcheon, Nora Lally–Graves, Lisa Briggs, Anne

Briggs, Jill Landers Jaquith, Harry James Landers, and Waldo David Landers Jaquith. The court held that the curfew law enacted by Defendant City of Charlottesville was likely to survive constitutional muster and that the factors set out in *Blackwelder Furniture Co. v. Seilig Manufacturing Co.*, 550 F.2d 189, 196 (4th Cir.1977), counseled against the issuance of preliminary injunctive relief.

On May 13, 1997, the court held a hearing on the merits of plaintiffs' claims and is now prepared to render a final decision in the case. Because the court has extensively set out its view of the governing law and relevant facts in this case in its previous Memorandum Opinion, this Memorandum Opinion should be read in tandem with the court's prior Memorandum Opinion. The court will, as best it can, attempt to avoid repeating itself. For the reasons stated in the court's April 30, 1997 Memorandum Opinion and for the reasons set out below, the court holds that plaintiffs' request for permanent injunctive relief must be denied, because the curfew law does not violate the United States Constitution.

## I. STANDARD OF REVIEW

At the hearing on the merits, there appeared to be some question as to the standard of review applicable to their constitutional attack upon the curfew law, although plaintiffs' counsel, Mary Bauer, stated that plaintiffs still took the position that strict scrutiny review applied: The court clearly set out the governing standard in its April 30, 1997 Memorandum Opinion. The court reiterates that a law which implicates a fundamental right guaranteed by the Constitution normally is subject to strict scrutiny review; insofar as the curfew law affects the rights of minors, and not adults, the curfew law need not hazard the rigors of strict scrutiny review.[1] The more lenient standard of

---

1. During her closing argument, counsel for plaintiffs suggested that the City of Charlottesville had failed to present any evidence to support the conclusion that the three factors articulated in *Bellotti v. Baird*, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979), should apply in this case; specifically plaintiffs' counsel maintained that the City put forward no proof that (1) the

decision by a child to roam the street at night might be a critical choice, and (2) parents may welcome the curfew law as a tool to reinforce their authority. Assuming such evidence is necessary, plaintiffs' counsel is incorrect. For instance, there is evidence in the record demonstrating that (1) some children roam the street on a regular basis and, as a consequence, perform

review that applies, however, is *not* the rational basis test (except insofar as plaintiffs challenge the law under the Equal Protection Clause solely because it distinguishes between individuals based on their age). Instead, to pass constitutional muster, the curfew law must be necessary to achieve a significant governmental interest, and there must be a substantial fit between means chosen by the curfew law (restricting certain activities of children under age seventeen during late-night and early-morning hours) and ends (protecting juveniles and reducing juvenile crime). This standard, in terms of stringency of review, falls somewhere in between strict scrutiny and the rational basis test.

Despite the court's conclusion that the curfew law need not pass strict scrutiny review, the court nonetheless, in its April 30, 1997 Memorandum Opinion, analyzed the curfew law under strict scrutiny review (again, except, of course, as to plaintiffs' challenge under the Equal Protection Clause). In this Memorandum Opinion, the court does the same; the court does so because the court believes the curfew law can survive even strict scrutiny, and, therefore, *a fortiori* must survive any lesser standard of review. To reiterate, the court holds that strict scrutiny review *does not* govern the curfew law, but assumes to the contrary for the purposes of this Memorandum Opinion and analyzes the curfew law as though strict scrutiny review applied.

## II. FREEDOM OF MOVEMENT

■ As the court stated in its prior Memorandum Opinion, the court accepts plaintiffs' contentions that freedom of movement is a fundamental constitutional right and that the curfew law impinges upon minors' rights to free movement. The court concluded in its

prior Memorandum Opinion, however, that the state interests in enacting the curfew law—protecting juveniles and reducing juvenile crime—were compelling. The court also found that the law likely employed the least restrictive means possible—only a few hours each night were burdened, and the curfew law offered many escape hatches through its list of exceptions. The hearing on the merits has not undermined the court's tentative finding, and the court now holds that the curfew law passes the least restrictive means test for the reasons discussed more extensively in its prior Memorandum Opinion. In deciding (at the preliminary injunction stage) that the evidentiary nexus between means and ends was probably sufficient to satisfy the narrowly-tailored requirement, the court relied upon the following evidence: the affidavit of the City's Police Chief, the affidavits of other police officers who work in Charlottesville; the testimony of the City's Commonwealth Attorney, who explained that most serious crimes occur at night and that juvenile crime was on the rise in Charlottesville; the affidavits of educators, including a high school principal and a counselor; the affidavits of City residents; the affidavit and testimony of an expert on curfews, who provided national and state statistics on crime, which showed an alarming increase in juvenile crime, nationally and locally; and statistics from Charlottesville's local court demonstrating an increase in juvenile delinquency cases.

During the hearing on the merits, the City offered additional evidence: it submitted police reports from 1996 and 1997 comparing the incidents of drunk driving, aggravated assault, robbery, and forcible rape during curfew hours and during noncurfew hours.[2] A summary chart revealed that as to all

---

poorly at school, and (2) parents' efforts to keep their children off the street are reinforced by the curfew law. The City offered affidavits from a school principal and a counselor who indicated that children's academic performance is suffering because they stay out late at night (during which time it can be inferred that the children are not engaged in their studies). John J. Gaines, III, a long-time City resident, and Alicia B. Lugo, also a City resident and the executive director for an organization that works with teenagers, attested that, increasingly, young children aggregate outside after midnight, shouting and making a general disturbance. Finally, the City's Chief of Police and the City's Commonwealth Attorney, cited parental efforts to secure their children's presence at home and the value of the curfew law in achieving this goal.

2. These incident reports were not broken down according to age of the perpetrators; nonetheless, the court finds the statistics useful.

offenses, the rate of offenses committed per hour was (substantially) greater during curfew hours. Two police officers, both of them with years of experience in law enforcement, also testified at the hearing on behalf of the curfew law. One of them, determined by the court to be an expert in the area of law enforcement, testified that juveniles faced more dangers during curfew hours than during the day, particularly from drug trafficking. He opined that the curfew law would save some children. Finally, the City (and plaintiffs) offered into evidence information considered by the City of Charlottesville in deciding to adopt the curfew; these exhibits included, *inter alia,* the community response to the curfew law, a poll of community members, numerous articles on curfew laws, data on (juvenile) crime incidence, and outlines of other cities' experience with curfew laws. The exhibits reveal considerable and careful deliberation and extensive research by the City and the proponents of the curfew law.

The copious evidence presented at the hearing on the merits, along with the evidence previously submitted by the City, establishes a strong evidentiary nexus between the means chosen by the City and the articulated governmental interest. The City has demonstrated a troubling (juvenile) crime problem that appears to be on the rise, to which juveniles also fall victim. Plaintiffs' rejoinder to the City's evidence, as discussed in the court's prior Memorandum Opinion, is to criticize the lingering uncertainty that, of necessity, must accompany passage of the curfew law. Of course it cannot be conclusively demonstrated that the curfew law will be effective; all too many variables factor into the equation. Nor can it be said that the curfew law is perfectly tailored to its goal; for instance, the inclusion of seventeen year olds might have made for a better fit between the classification and the governmental interest. But, even under strict scrutiny review, the law does not demand the perfection of a scientific equation from local governments. Demonstrating any proposition with absolute certainty in many cases may be an impossibility, considering all the factors which must be brought into the matrix before the legislative body and on which factors that body must rely in reaching con-

clusions. Thus, as the Supreme Court has made clear, the Constitution does not impose such a standard. *See Ginsberg v. New York,* 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968). There is no requirement of perfect tailoring, but only of narrow tailoring; were it otherwise, there would be no need to perform strict scrutiny analysis, for strict scrutiny would be "strict only in theory but fatal in fact," *see* Gerald Gunther, *The Supreme Court, 1971 Term—Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection,* 86 Harv. L.Rev. 1, 8 (1972).

The only additional evidence plaintiffs submitted at the hearing on the merits to challenge the evidentiary nexus between the means employed by the curfew law and its ends is ultimately unpersuasive. For instance, the telephonic deposition by plaintiffs' expert, Dr. Jeffery Alan Butts, reveals that Dr. Butts is unfamiliar with Charlottesville or its crime problem; he knows little of the City's demography or its crime trends. *See* Dr. Butts Deposition at 42, 50, 62. Moreover, his study focused on cities in South Carolina *with* curfew laws; his study, purporting to find more crime during the day than at night, did not account for the fact that the curfew laws might have reduced the level of night-time crime. Indeed, Dr. Butts even conceded this possibility. *Id.* at 57–58. Another reason Dr. Butts's analysis is problematic rests with the inclusion of simple assault—a crime of relatively less seriousness—in his calculations of crime rate. *Id.* at 59. It is interesting and telling that no law enforcement officials (those with first-hand knowledge of crime) testified in support of Dr. Butts's conclusions; plaintiffs did offer the testimony of a retired police officer, but, while he explained that he was not a champion of Charlottesville's curfew law, he stated that, as a police officer, he would have had no objection to it. The police officer offered two reasons for his position. First, he explained that he was concerned that the police department lacked the resources to enforce the curfew law; specifically, he feared that the police department would have no facility to place children who violated curfew. The second reason for the police officer's lack of

enthusiasm was, ironically, that he worried that the curfew law would be tied up with legal challenges.

Even if Dr. Butts's conclusions were free from such problems, the court would be loath to accept the testimony of one expert (with whom some experts agree and others disagree) to invalidate a law supported by careful deliberations of a legislative body with an immediate stake in and familiarity with its community, when that legislative body has thoroughly considered substantial evidence relating to curfews and has credited one view over the other. There is no basis for this court to credit Dr. Butts's expert over that of the City's expert; that, quintessentially, is the legislature's job. Under strict scrutiny review, the City must show that there exists an evidentiary nexus between ends and means; but in so doing, it cannot be expected conclusively to rebut all other opinions.

Plaintiffs' exhibits reveal that plaintiffs' counsel, Mary Bauer, and some of the plaintiffs in this case (Mr. Daniel Schleifer and Mr. Waldo Jaquith, for instance), were present during public hearings on the curfew law and expressed their opposition to the law. They lost the legislative battle, and now they come to the court, asking it to reverse their loss.[3] The court declines to do so, because the law survives even strict scrutiny review; the court holds the curfew law is narrowly tailored to a compelling governmental interest.

## III. PARENTING RIGHTS

■ In its previous Memorandum Opinion, the court concluded, on the evidence then before it, that the restriction upon parental rights imposed by the curfew law was only minimal (i.e., not of constitutional significance) and that plaintiffs were unlikely to prevail on the merits of this claim.

No evidence presented at the hearing on the merits alters the court's tentative conclusion in its Memorandum Opinion of April 30, 1997. The only parent who testified, Mr. Harry James Landers, reiterated his statement which had been already submitted to the court by affidavit. His position—that regardless whether his child is fifteen, ten, or five years old, he would like to have absolute control over the child's activities—does not comport with Supreme Court precedent, under which the state has an independent interest in the well-being and safety of children, which may at times conflict with parental desires. To give just one example, Mr. Landers could not authorize his daughter (if she were five years old, for instance) to make nightly visits to a bar so she could listen to jazz music if, under state law, entry was to be denied all individuals under the age of eighteen. This is so even if Mr. Landers were completely and sincerely convinced that nocturnal jazz was essential to the development and cultural enrichment of his five year old.

Based on the reasoning above and the reasoning laid out in far more detail in its prior Memorandum Opinion, the court holds that the curfew law does not infringe upon parental rights to a constitutionally significant degree.

## IV. FIRST AMENDMENT AND VAGUENESS

■ As discussed in the court's April 30, 1997 Memorandum Opinion, the curfew law contains an exemption for juveniles who wish

---

**3.** In its prior Memorandum Opinion, in the course of reflecting upon the *public interest* at stake in the curfew law, the court noted that there was evidence indicating that the black community in Washington, D.C. supported a curfew law similar to the one enacted by Charlottesville (the District's curfew law, as discussed in the court's previous Memorandum Opinion, was recently struck down by a federal court). Apparently in response to the court's observation, plaintiffs' counsel offered the testimony of two black citizens in Charlottesville's community, both of whom expressed opposition to the curfew law. The court credits their testimony as an honest account of their sincerely held beliefs. However, neither of these citizens were experts in sociology; nor had either conducted any surveys or polls upon which they could base their conclusions; their evidence was of an anecdotal nature. Unsurprisingly, as the cross-examination of City's counsel demonstrated, various black leaders in the Charlottesville community support the curfew law (two of whom have submitted affidavits with the court). Second, and more to the point, the opinion of any group of lay citizens as to the desirability of a law cannot decide the constitutionality of that law.

to exercise their First Amendment rights after 12:01 a.m. or 1:00 a.m., as the case may be. Plaintiffs, however, challenge the First Amendment exception and the exception for civic organization on vagueness grounds. The court, in full detail, laid out the governing law and discussed how it applies to this case in its prior Memorandum Opinion. Here, the court will discuss only the issues newly raised at the hearing on the merits. The court will address the vagueness challenge to the exception for the First Amendment and to the civic organization exception together.[4]

On this subject, the remarks of the three minor plaintiffs who testified are illuminating. Mr. Daniel Schleifer, an articulate young sixteen year old, testified that although he certainly disliked the curfew law, the curfew law had no direct effect on him. Nor did he have any fears of arrest.[5] At the hearing on the merits, Mr. Schleifer and his fellow plaintiff, Mr. Waldo Jaquith, asserted that during curfew hours they engaged in political discussions on the downtown mall. The court is somewhat troubled by these sudden assertions, of which no mention was made in Mr. Schleifer's and Mr. Jaquith's affidavits (filed in support of plaintiffs' motion for preliminary injunctive relief) and which assertions followed the court's April 30, 1997 Memorandum Opinion, in which the court mentioned politics in connection with the First Amendment on a few occasions. In any event, politics and political discourse lie at the very core of the First Amendment, *see* Paul B. Stephan, *The First Amendment and Content Discrimination,* 68 Va. L.Rev. 203 (1982), and there can be no reasonable doubt on any citizen's part that the First Amendment covers political debates. Thus, if Messrs. Schleifer and Jaquith believe that the ideal time to discuss politics is in Charlottesville's downtown mall at the strike of midnight (or after 1:00 a.m.), they may do so without violating the curfew law.

Like Mr. Schleifer, Mr. Jaquith testified that the curfew had no direct effect on his actions, partly because he is eighteen; the curfew law affected Mr. Jaquith only indirectly, through his friends, some of whom are under seventeen years of age and are consequently constrained by the curfew law. When questioned by his counsel regarding whether all of the activities in which he and his friends engaged were covered by the exceptions in the curfew law, Mr. Jaquith responded that roller blading (after 12:01 a.m. or 1:00 a.m.) would probably be prohibited under the curfew law, unless, he speculated, "an expensive lawyer" could convince a court that it fell within the First Amendment exception. Ironically, plaintiffs' counsel, Mary Bauer, essentially makes this very argument: that activities such as roller blading are indeed covered by the First Amendment, because roller blading encompasses more than just skating—children are engaged in associational activity while they glide. Mr. Jaquith's comment, supported by the law and the young man's common sense, suggests a realization that the First Amendment to the United States Constitution does not cover roller blading (contrary to his lawyer's efforts to recharacterize roller blading and like activities). Even if, however, Mr. Jaquith believes to the contrary, this is irrelevant, for such a belief would be unreasonable.

Finally, Ms. Lisa Briggs, a precocious young lady of thirteen, made clear her adamant disdain for the curfew law and the impositions it worked upon her social schedule. She also testified that, contrary to the court's prior assumption, when she volunteered at the local theater, an adult was not always present. Thus, Ms. Briggs' theatrical activities would not be covered under the exception for civic organizations. The court previously had avoided addressing the question whether the First Amendment exception was vague as to theater participation (because the court believed theater participation

---

4. The emergency exception, as the court previously explained in unequivocal language, is sufficiently clear to put a person of ordinary intelligence on notice as to what is covered.

5. Elaborating, Mr. Schleifer explained that he had no fears of arrest because he was white and speculated that a young black man would be fearful. No black youths, however, testified that they had such concerns.

would be covered under the civic organization exception). Squarely confronting this question now, the court holds that the First Amendment exception is not unduly vague as it applies to theater rehearsals. Artistic expression, though further removed from core First Amendment protection than politics, is essential to our "marketplace of ideas;" art provides richness, depth, and texture that would otherwise be absent from our democracy and public life. One need not be steeped in First Amendment jurisprudence to understand this; a reasonably educated person would know that theater productions—including theater rehearsals—are included within the First Amendment's guarantee of free speech and expression. *Cf. Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (Rehnquist, C.J.) (stating that even theaters in which nude dancing is performed are entitled to some First Amendment protection).

None of the plaintiffs offered examples of any other conduct in which they engaged that does not fall either clearly within or clearly beyond the First Amendment exception or the exception for civic organizations (the exceptions plaintiffs challenge as vague). Therefore, for the reasons stated in greater detail its previous Memorandum Opinion and for the reasons set out above, the court holds that the curfew law does not infringe plaintiffs' right to the First Amendment and is not void for vagueness.

## V. FOURTH AMENDMENT

Plaintiffs informed the court at the hearing that they were abandoning their claim that the curfew law, on its face, violates the Fourth Amendment. As should be clear from the court's discussion of plaintiffs' Fourth Amendment claim in its April 30, 1997 Memorandum Opinion, the court agrees that there is no merit to the claim that the curfew law, on its face, vitiates the requirement of probable cause or reasonableness.

## VI. FOURTEENTH AMENDMENT AND THE EQUAL PROTECTION CLAUSE

For the reasons stated in this Memorandum Opinion and the court's previous Memo-

randum Opinion, the age-based classification used by the curfew law easily survives the rational basis test that applies when neither a suspect class nor a fundamental right is implicated. Therefore, the curfew law cannot be struck down on equal protection grounds.

## VII. SUMMARY

The court believes that the curfew law reflects the City's justifiable effort to protect our youth and to reduce an unacceptably high level of crime. The curfew law suffers from no constitutional infirmity. Thus, the court rejects plaintiffs' constitutional attack upon the law.