Tiana HUTCHINS, a minor, by Julia
C. OWENS, her grandmother, et
al., Appellees,

v.

DISTRICT OF COLUMBIA, Appellant.

No. 96–7239.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 8, 1997.

Decided May 22, 1998.

Steven J. Rosenbaum argued the cause for appellant, with whom Jo Anne Robinson, Interim Corporation Counsel, Charles L. Reischel, Deputy Corporation Counsel, Donna M. Murasky, Assistant Corporation Counsel, and Jason A. Levine were on the briefs.

Robert S. Plotkin argued the cause for appellees, with whom Jay A. Morrison, Patricia L. Hurst, and Arthur B. Spitzer were on the brief.

Eric H. Holder, Jr., U.S. Attorney at the time the brief was filed, R. Craig Lawrence and Kimberly N. Tarver, Assistant U.S. Attorneys, were on the brief for the United States of America as amicus curiae.

Before: SILBERMAN, ROGERS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

Opinion concurring in the judgment filed by Circuit Judge TATEL.

Dissenting opinion filed by Circuit Judge SILBERMAN.

ROGERS, Circuit Judge:

Confronted with evidence of increasing juvenile violence and victimization in the District of Columbia, and informed about the success of other cities in reducing such problems through the enforcement of juvenile curfews, the Council of the District of Columbia enacted the Juvenile Curfew Act of 1995. The Council modeled the Act on a Dallas, Texas, ordinance that the United States Court of Appeals for the Fifth Circuit had held was constitutional. *See Qutb v. Strauss,* 11 F.3d 488, 496 (5th Cir.1993). The main provision of the D.C. Act bars unmarried and unemancipated persons[1] under seventeen years old from being in public unaccompanied by a parent or equivalent adult supervisor from 11:00 p.m. to 6:00 a.m. on Sunday through Thursday nights or from 12:01 a.m. to 6:00 a.m. on Friday and Saturday nights, with certain enumerated "defenses." *See* D.C.CODE §§ 6– 2182(1), –2183(a)(1), (b)(1) (Supp.1997). Thirteen months after the Act took effect, the district court enjoined its enforcement, ruling in light of evidentiary deficiencies that the Act violated the minor appellees' equal protection and due process rights and violated the appellee parents' right to due process. *See Hutchins v. Dis-*

*trict of Columbia,* 942 F.Supp. 665, 668 (D.D.C.1996). The District of Columbia, joined by the United States as amicus, appeals the grant of summary judgment to appellees. We affirm, albeit with different analyses. While the court is unanimous that the case is not moot, *see infra* Part II, we apply different tests to evaluate the constitutionality of the Act. I apply an intermediate scrutiny test in light of competing individual and governmental interests, while Judge Tatel applies strict scrutiny and Judge Silberman applies a rational basis test. Judge Tatel and I agree that the Act fails to survive under intermediate or strict scrutiny review; Judge Silberman dissents, concluding that the Act survives rational basis review.

### I.

Appellees, nine persons under the age of seventeen at the time[2] and four parents, all residents of the District of Columbia ("the District"), and a movie theater corporation sued the District to enjoin enforcement of the Juvenile Curfew Act of 1995 ("the Act"). They sought a declaration that the Act violates rights guaranteed by the First, Fourth, and Fifth Amendments to the United States Constitution and exceeds the police powers of the District of Columbia. Their principal allegations were that the Act violates the minors' Fifth Amendment equal protection and due process rights by impinging upon their fundamental right to free movement; the Act violates their First Amendment rights to free speech and association and is both overbroad and unconstitutionally vague; and the Act violates their Fourth Amendment rights to be free of unreasonable searches and seizures in that it allows the

---

1. Although the curfew law is entitled the "Juvenile Curfew Act of 1995," the law does not apply to "juveniles," but rather to "minors" who are defined in the law as unmarried and unemancipated persons under the age of seventeen. *See* D.C.CODE § 6–2182(5) (Supp.1997). The term "juvenile" is not defined in the curfew law nor in the D.C. statutes governing delinquency, which instead pertain to "child[ren]," who are persons under age eighteen not charged with crimes that lead to prosecution as adults. *See id.* § 16–2301(3) (Repl.Vol.1997). Nevertheless, the common definition of "juvenile" is that defined in federal law as a person under the age of eighteen. *See* 18 U.S.C. § 5031 (1994); *Hutchins v. District of Columbia,* 942 F.Supp. 665, 666 n. 1 (D.D.C.1996). For the sake of clarity, references

to "minors" in this opinion refer to persons under seventeen years old; the term "juveniles" refers to persons under eighteen years old; the phrase "juvenile curfews" refers to curfew laws affecting any class of young people.

2. Seven minor plaintiffs were residents of Northwest Washington, D.C., and one minor plaintiff resided in each of Southwest and Southeast Washington, D.C. During the pendency of this appeal, all of the minor plaintiffs passed their seventeenth birthdays, and thus they are no longer subject to the provisions of the Act governing the behavior of minors under the age of seventeen. This fact does not make this appeal moot, however, as discussed below. *See infra* Part II.

police to stop minors and take them into custody based only on a reasonable belief that the Act has been violated. In addition, appellees alleged that the Act violates the parents' Fifth Amendment due process rights because, by removing parents' discretion to allow children to be in public places during curfew hours unaccompanied by a person at least twenty-one years old, the Act impinges upon parents' fundamental right to autonomy in raising children. Finally, appellees alleged that the Act exceeds the District's police powers by criminalizing minors' participation in legitimate educational, cultural, vocational, athletic, social, and family-related activities during curfew hours. Appellees argued that, because the Act infringes on both the minors' and parents' fundamental rights, it is subject to strict scrutiny review, which, they asserted, it fails to satisfy.

Upon considering the parties' cross motions for summary judgment, the district court granted judgment for appellees and enjoined enforcement of the Act. *See Hutchins,* 942 F.Supp. at 684. The court agreed that minors have a fundamental right to free movement, reasoning from the Supreme Court's acknowledgments that minors have constitutional rights and that adults have a fundamental right to free movement to the conclusion that, in the context of a curfew law, there is no reason to treat minors' right to free movement differently from that of adults. *See id.* at 670–74. Then, concluding that the Act infringes minors' fundamental right to free movement as well as parents' fundamental right to direct their children's upbringing, the court applied a strict scrutiny test and found that while the District had demonstrated a compelling need for the curfew, it had failed to demonstrate that the Act is narrowly tailored to serve that need. *See id.* at 674–80. Based on deficiencies in the District's evidentiary justification for a nexus between the curfew and a future reduction in juvenile victimization and crime, the court concluded that the Act affects too many minors engaged in legitimate activities. *See id.*

at 680. The court further ruled that four of the Act's curfew "defenses" are unconstitutionally vague, *see id.* at 679, but did not reach the minor appellees' First and Fourth Amendment challenges, *see id.* at 680 n. 19. Because the Act also affects parents exercising appropriate supervision of their children, the court ruled that the Act infringes upon parents' fundamental rights in violation of the Fifth Amendment. *See id.* at 680.

On appeal, the District of Columbia contends that the Act is constitutional, curtailing only limited late night activities of unsupervised minors and thereby interposing only a minor interference with parental autonomy. The District maintains, first, that the district court erred in applying a strict scrutiny standard in the face of authority rejecting any fundamental right of minors to wander unsupervised at night, Supreme Court precedent regarding more general limitations on minors' rights and parental autonomy, and the Supreme Court's stringent guidelines for the identification of new fundamental rights. Alternatively, the District maintains that even if strict scrutiny is the proper standard, the Act still should be upheld: the district court's finding that the District has a compelling interest in preventing juvenile crime and protecting juveniles against victimization is supported by abundant evidence and the Act is narrowly tailored to that interest, as demonstrated by evidence that the district court rejected. Finally, the District maintains that the Act does not violate appellees' First or Fourth Amendment rights, and that the district court erred in ruling that four of the curfew exceptions in the Act are unconstitutionally vague without offering either an explanation or a saving construction as required by Supreme Court precedent.

The constitutionality of a juvenile curfew statute is a question of first impression in this court, and our review is *de novo.*[3] *See Wilson v. Pena,* 79 F.3d 154, 160 & n. 1 (D.C.Cir.1996); *Propert v. District of Columbia,* 948 F.2d 1327, 1331 (D.C.Cir.1991).

**3.** Notwithstanding the large number of cities having juvenile curfew laws, *see* William Ruefle & Kenneth Mike Reynolds, *Curfews and Delinquency in Major American Cities,* 41 CRIME & DELINQ. 347, 353 (1995), few circuit courts have ruled on such laws' constitutionality. Although the Fifth Circuit struck down one juvenile curfew

law as unconstitutionally overbroad, *see Johnson v. City of Opelousas,* 658 F.2d 1065, 1074 (5th Cir. Unit A Oct. 1981), the court upheld a later juvenile curfew, *see Qutb,* 11 F.3d at 496, as did the Third Circuit, *see Bykofsky v. Borough of Middletown,* 401 F.Supp. 1242, 1266 (M.D.Pa. 1975), *aff'd,* 535 F.2d 1245 (3d Cir.1976). · Re-

The Act establishes a curfew from 11:00 p.m. until 6:00 a.m. the next day for Sunday night through Thursday night, and between 12:01 a.m. and 6:00 a.m. on Friday and Saturday nights and daily throughout July and August. *See* D.C.CODE § 6–2182(1) (reprinted in the Appendix to this opinion). The curfew applies only to "minors," who are defined as persons under age seventeen who are neither emancipated nor married. *See id.* § 6–2182(5). During curfew hours, a minor may not be "in any public place or on the premises of any establishment within the District of Columbia" without appropriate adult supervision. *Id.* § 6–2183(a)(1), (b)(1)(A). An "adult" is defined as a parent or any person twenty-one years or older whom the minor's parent has authorized to be a caretaker. *See id.* §§ 6–2182(8). The Act also provides that a person under age eighteen shall not operate a motor vehicle in the District after midnight, except when authorized under the Act. *See id.* § 40–301(g) (Supp. 1997). A police officer who "reasonably believes" that a curfew violation has occurred may inquire of the minor about the minor's age and reasons for being in public and, upon determining that the minor is violating the curfew, may hold the minor in custody until the minor's parent arrives or 6:00 a.m. the following morning, whichever occurs first. *Id.* § 6–2183(c).

A minor who violates the Act can be required by a court to perform up to twenty-five hours of community service for each violation. *See id.* § 6–2183(d)(4). Violation of the driving restriction can result in suspension of one's driver's license for up to one year. *See id.* § 40–301(g). Both a parent or guardian of a minor who either knowingly permits or, because of insufficient control, allows the minor to violate the Act and the owner, operator, or any employee of an es-

tablishment who violates the Act by knowingly allowing a minor to remain on its premises during curfew hours may be fined up to $500 or ordered to perform community service. *See id.* § 6–2183(a)(2)–(3), (d)(1). A parent (and persons *in loco parentis*) may also be required to attend parenting classes. *See id.* § 6–2183(d)(2).

The Act provides eight "defenses" to a curfew violation. Thus, a minor does not violate the Act if: (1) accompanied by a parent, guardian, or any other person twenty-one years or older authorized by a parent to care for the minor; (2) on an errand for the parent, guardian, or anyone twenty-one years or older authorized by a parent to care for the minor; (3) in a vehicle traveling interstate; (4) engaged in employment or commuting to or from employment; (5) involved in an emergency situation; (6) on the sidewalk abutting the minor's or a next-door neighbor's residence, if the neighbor has not complained to police; (7) attending an official school, religious, or other activity sponsored by the District, a civic organization, or a similar entity that takes responsibility for the minor; or (8) exercising First Amendment rights, including the freedoms of religion and speech and the right of assembly. *See id.* §§ 6–2182(8), –2183(b)(1)(A)–(H).

The Act originally also included a sunset clause whereby the curfew regime would expire after two years. *See* D.C. Act 11–90, § 6(b) (July 6, 1995). At least ninety days prior to the date of expiration, the Mayor was required to report to the Council of the District of Columbia ("D.C. Council") on the effectiveness of the curfew restrictions and to recommend whether the Act should be extended. *See* D.C.CODE § 6–2183(e)(1). Prior to expiration of the two-year period, and without a report from the Mayor, however, the D.C. Council extended the Act indefinitely.[4]

---

cently, the Ninth Circuit held unconstitutional a juvenile curfew lacking sufficient exceptions for legitimate activities. *See Nunez v. City of San Diego*, 114 F.3d 935, 947–51 (9th Cir.1997). Also, the Second Circuit held a curfew unconstitutionally void for vagueness because it failed to provide an hour at which the curfew ended. *See Naprstek v. City of Norwich*, 545 F.2d 815, 818 (2d Cir.1976).

4. The Act was due to expire, pursuant to the sunset provision, two weeks after oral argument in this court. The D.C. Council enacted emergency legislation, D.C. Act 12–148, § 2 (Sept. 12, 1997), and temporary legislation, D.C. Act 12–160, § 2 (Oct. 3, 1997), to extend the Act through May 3, 1998. Thereafter, the D.C. Council enacted legislation permanently repealing the sunset provision. D.C. Act 12–331 (Apr. 20, 1998); *see* Appendix to this opinion. As a result of the district court's injunction, the curfew regime had

In view of the recent seventeenth birthdays of all the minor appellees, *see supra* note 2, we first address, in Part II, whether their challenges to the Act are moot and not otherwise before the court. Although the District is appealing the district court's judgment and order, upon review of the grant of summary judgment the case appears in this court in the same posture as it did in the district court and, therefore, this court must determine whether the minors' challenges to the Act remain "alive." *See DeFunis v. Odegaard,* 416 U.S. 312, 316, 94 S.Ct. 1704, 1705–06, 40 L.Ed.2d 164 (1974). Concluding in Part II that the minor appellees' claims are presented to this court in a representative capacity by the appellee parent of a child under the age of seventeen, we address in our separate opinions the minor appellees' challenges to the Act. As Judge Tatel and I conclude that the Act violates the equal protection and due process rights of the minor appellees, we do not reach appellees' other challenges.

## II.

■ While this appeal was pending, the last of the named minor appellees became age seventeen, and hence they all are no longer subject to the Act, except the motor vehicle restriction, which applies to those not yet age eighteen. Thus, their principal challenges to the Act are moot because the minor appellees were not certified as representatives of a class pursuant to Federal Rule of Civil Procedure 23. *See United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 398, 400–01 n. 7, 404, 100 S.Ct. 1202, 1211 n. 7, 63 L.Ed.2d 479 (1980); *Board of Sch. Comm'rs v. Jacobs,* 420 U.S. 128, 129, 95 S.Ct. 848, 849–50, 43 L.Ed.2d 74 (1975). Indeed, they expressly declined to pursue class certification in the district court. Of the remaining named appellees, however, at least one is a parent with a child under age seventeen.[5]

The question, therefore, is whether this parent can raise the claims of his minor child, claims that are the same as those of the appellees who were subject to the curfew when the complaint was filed, or whether instead those claims are moot except to the extent they relate to the motor vehicle restriction.[6]

■ This is not a case in which the familiar exception to the mootness doctrine for issues "capable of repetition yet evading review" is applicable. That exception is confined to situations in which there is a reasonable expectation that the same complaining party would be subjected to the same action again. *See Honig v. Doe,* 484 U.S. 305, 317–20, 108 S.Ct. 592, 600–03, 98 L.Ed.2d 686 (1988); *Weinstein v. Bradford,* 423 U.S. 147, 148–49, 96 S.Ct. 347, 348–49, 46 L.Ed.2d 350 (1975); *Sosna v. Iowa,* 419 U.S. 393, 399–400, 95 S.Ct. 553, 557–58, 42 L.Ed.2d 532 (1975); *Burlington N. R.R. v. Surface Transp. Bd.,* 75 F.3d 685, 689 (D.C.Cir.1996); *Doe v. Sullivan,* 938 F.2d 1370, 1378 & n. 13 (D.C.Cir. 1991); *Bois v. Marsh,* 801 F.2d 462, 466 (D.C.Cir.1986). Because the minor appellees have reached age seventeen, they are no longer subject to the curfew restrictions (except the motor vehicle restriction) and will never again be subject to the curfew restrictions for persons under age seventeen.

■ Instead, the third party (or *jus tertii*) standing doctrine of *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), and its progeny applies and provides the basis for our conclusion that the minor appellees' challenges to the Act remain before this court. "Ordinarily, one may not claim standing ... to vindicate the constitutional rights of some third party." *Barrows v. Jackson,* 346 U.S. 249, 255, 73 S.Ct. 1031, 1034, 97 L.Ed. 1586 (1953); *see United States v. Raines,* 362 U.S. 17, 21, 80 S.Ct. 519, 522–23, 4 L.Ed.2d 524

---

not been in effect for the two-year trial period originally contemplated in the sunset provision when the D.C. Council extended the Act.

5. Two adult appellees have children under the age of seventeen as of the writing of this opinion. Clearly one child will still be younger than seventeen when this opinion issues; the second child, however, may have turned seventeen by that time.

6. Another mootness aspect of the instant case of which we take judicial notice, *see* FED.R.EVID. 201(b), (c); *Nantucket Investors II v. California Fed. Bank (In re Indian Palms Assocs., Ltd.),* 61 F.3d 197, 205 (3d Cir.1995), arises as a result of the cessation of operations of the Biograph Theatre Corporation, which joined as a named plaintiff in challenging the Act.

(1960). The Supreme Court observed in *Craig*, however, that its limitations on the right to raise the interests of third parties, where the interests of the litigant and the proposed third party are "in no way mutually interdependent," *Craig*, 429 U.S. at 195 n. 4, 97 S.Ct. at 456 n. 4, are "not constitutionally mandated, but rather stem from a salutary 'rule of self-restraint' designed to minimize unwarranted intervention into controversies where the applicable constitutional questions are ill-defined and speculative," *id.* at 193, 97 S.Ct. at 455. Acknowledging that the reasons for such limitations are not furthered where the lower court has already addressed the relevant constitutional challenge and the parties have never resisted an authoritative constitutional determination, the Court concluded that forgoing consideration of the merits in order to wait for a new challenge by injured third parties "would be impermissibly to foster repetitive and time-consuming litigation under the guise of caution and prudence." *Id.* at 193–94, 97 S.Ct. at 455.

This is just such a case. Under the Act, parents can be sanctioned for allowing their minor children to violate the curfew. *See* D.C.CODE § 6–2183(a)(2), (d)(1)-(2). In comparable circumstances in *Craig*, the Supreme Court held that, because a bartender could be sanctioned under a statute barring sale of beer to males under age twenty-one and females under age eighteen, the bartender had standing to raise the equal protection claims of a male plaintiff who had reached age twenty-one during the appeal and whose claims had thus become moot. *See Craig*, 429 U.S. at 195, 97 S.Ct. at 455–56. Furthermore, the other relevant considerations underlying the third party standing doctrine, articulated in cases following *Craig*, all point toward the conclusion that the court should proceed to address the minor appellees' claims.

■ As further elaborated by the courts, the third party standing doctrine involves the consideration of four factors, one constitutional and three prudential. First, the litigant asserting the third party's claims must himself or herself suffer an Article III injury-in-fact. *See Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623–24 n. 3, 109 S.Ct. 2646, 2651 n. 3, 105 L.Ed.2d 528 (1989). The alleged infringement of the

parent's own rights, coupled with the parental sanctions under the Act, are sufficient to establish that the appellee parent meets this requirement. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992). Second, the court will look for the presence of three prudential considerations: (1) a close relationship between the litigant and the third party whose rights are being asserted; (2) a barrier keeping this third party from asserting such rights himself or herself; and (3) an impact of the litigation on the rights of the third party. *See Caplin & Drysdale*, 491 U.S. at 623–24 n. 3, 109 S.Ct. at 2651 n. 3; *see also Powers v. Ohio*, 499 U.S. 400, 410–11, 111 S.Ct. 1364, 1370–71, 113 L.Ed.2d 411 (1991).

The first of these prudential considerations is clearly satisfied in the instant case. At least two circuits, which we join, have held that the parent-child relationship is sufficiently close to meet prudential standing requirements. In a case directly on point, the Fifth Circuit held in *Johnson v. City of Opelousas*, 658 F.2d 1065 (5th Cir. Unit A Oct. 1981), that the mother of children still subject to a juvenile curfew could raise her son's claims despite their becoming moot when her son became seventeen. *See id.* at 1069. In *Lindley ex rel. Lindley v. Sullivan*, 889 F.2d 124 (7th Cir.1989), the Seventh Circuit held that an adopted child receiving disability benefits had standing to assert his parents' equal protection claims regarding denial of child insurance benefits, on the observation that the parent-child relationship was "much closer than [the relationship] in leading cases where standing has been found to exist, as between a physician and a patient or between a beer vendor and a class of potential purchasers of the product." *Id.* at 129 (citations omitted).

The third prudential consideration also militates in favor of allowing third party standing. The parent has explicitly referred to the direct impact of the curfew on the rights asserted by the minor appellee. A decision based on the parent's third party standing would definitely have a significant impact upon those rights.

The only prudential factor not clearly evident in the instant case is the second, since a very young plaintiff undoubtedly could be found to bring a lawsuit challenging the curfew (although even a plaintiff who is quite young at the beginning of the litigation might turn seventeen by the end). Yet in *Caplin & Drysdale*, the failure to satisfy the second prudential factor did not defeat third party standing. *See Caplin & Drysdale*, 491 U.S. at 623–24 n. 3, 109 S.Ct. at 2651 n. 3; *cf. Department of Labor v. Triplett*, 494 U.S. 715, 720–21, 110 S.Ct. 1428, 1431–32, 108 L.Ed.2d 701 (1990). Indeed, in *Craig* itself, the Supreme Court allowed third party standing even though there was no barrier to would-be beer-drinkers' pressing their own claims. *See Craig*, 429 U.S. at 192–97, 97 S.Ct. at 454–57. Similarly, this circuit has repeatedly found that the absence of the second prudential factor may not outweigh the other factors in evaluating whether a litigant has third party standing. *See FAIC Secs., Inc. v. United States*, 768 F.2d 352, 360–61 (D.C.Cir.1985); *United Steelworkers of Am. v. Marshall*, 647 F.2d 1189, 1241 (D.C.Cir.1980).[7] In the instant case, we conclude that the closeness of the relationship between parents and children and the magnitude of the potential impact of our decision on children's rights outweigh the absence of the second prudential factor. *Cf. Caplin & Drysdale*, 491 U.S. at 623–24 n. 3, 109 S.Ct. at 2651 n. 3.[8]

Indeed, the proposition that parents who satisfy Article III standing requirements to raise their own claims may have standing to raise their children's claims as well, even without an actual barrier preventing children from doing so themselves, also follows from *Smith v. Organization of Foster Families for Equality & Reform*, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977), and like cases. In that case, the Supreme Court held that foster parents had standing to challenge the deprivation of foster children's right not to be removed from their foster homes without due process. *See id.* at 841 n. 44, 97 S.Ct. at 2108 n. 44; *cf. Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 546–49, 106 S.Ct. 1326, 1333–36, 89 L.Ed.2d 501 (1986). Prudential standing principles have not barred suits by parents raising equal protection and First Amendment claims on behalf of themselves and their children in school desegregation and school prayer cases, although the cases have not explicitly addressed standing. *See, e.g., Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406, 408–09 n. 1, 97 S.Ct. 2766, 2769–70 n. 1, 53 L.Ed.2d 851 (1977); *Engel v. Vitale*, 370 U.S. 421, 423, 82 S.Ct. 1261, 1263, 8 L.Ed.2d 601 (1962); *Zorach v. Clauson*, 343 U.S. 306, 309–10 & n. 4, 72 S.Ct. 679, 681–82 & n. 4, 96 L.Ed. 954 (1952). This court has similarly allowed parental challenges to violations of their children's equal protection rights in school. *See, e.g., Bulluck v. Washington*, 468 F.2d 1096, 1109 n. 14 (D.C.Cir. 1972) (Robinson, J., dissenting).

Furthermore, this result accords with the rationale for third party standing as articulated by the Supreme Court in *Singleton v. Wulff*, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976), even if there is no actual barrier preventing children from raising their own claims. In *Singleton*, the Court instructed that third party standing is appropriate where "the enjoyment of the right [of the third party] is inextricably bound up with the activity the litigant wishes to pursue," and "the litigant ... is fully, or very nearly, as effective a proponent of the right [as the party whose right is being asserted]." *Id.* at 114–15, 96 S.Ct. at 2874. The appellee parent with the minor child under age seventeen asserts that the curfew interferes not only with his parental right to allow his child to stay out, without adult supervision, after curfew hours, but also with his minor son's

---

7. *Compare Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 809–10 (D.C.Cir.1987) (denying third party standing to raise Fourth Amendment rights), *with National Cottonseed Prods. Ass'n v. Brock*, 825 F.2d 482, 491 (D.C.Cir.1987) (confining the *Haitian Refugee* holding to the Fourth Amendment context and "conclud[ing] that *FAIC Securities* continues to state law of the circuit").

8. Moreover, in *Singleton v. Wulff*, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976), the Supreme Court suggested that imminent mootness of a claim presents a judicially recognized obstacle to the assertion of rights on one's own behalf. *See id.* at 117–18, 96 S.Ct. at 2875–76. To the extent that this is true, it reinforces the notion that the second prudential factor does not prevent parents from possessing third party standing in cases such as *Johnson* and the instant case.

rights to engage in legitimate social activities and interests during times when the curfew is in effect, the very claims raised by the minor appellees. The instant case falls neatly within the rationale for third party standing.

Therefore, in light of *Craig* and its progeny, we hold that the appellee parent with a child under age seventeen who remains subject to the curfew has standing to raise the challenges to the curfew presented by the minor appellees whose claims have become moot as a result of the passage of time. The parent has suffered an injury-in-fact sufficient to confer Article III standing. Regarding the rights of his minor child, the appellee parent voices the same objections reflected in the minor appellees' challenges to the Act. The nature of the parent-child relationship suffices to ensure that the parent is an effective advocate for the minor appellees' interests, and disposition of the parent's claims will have a direct impact on the rights asserted by the minor appellees. Under the circumstances, it would be a waste of judicial resources at this late stage of the proceedings to abandon consideration of minor appellees' claims when the Act applies to other District of Columbia minors.

### III.

■ The minor appellees contend that the Act restricts their fundamental right to free movement in violation of their due process and equal protection rights. In addition, they maintain that the Act violates their First Amendment rights of speech and association and their Fourth Amendment right to be free from unreasonable searches and seizures. First, I address in section III.A, the standard of review appropriate for analysis of minor appellees' due process and equal protection contentions; in section III.B, the District's purpose in enacting the Act; and in section III.C, the data offered to show the required connection between the problem and the solution.

### A.

The District contends, and the United States agrees, that the district court erred in ruling that minors enjoy a fundamental constitutional right of free movement, that hence the Act must be reviewed under a rational basis test, and that the Act easily meets this standard. Appellees contend that the Act fails both a rational basis test as well as a strict scrutiny test, and that, in any event, because minors have a fundamental right to free movement upon which the Act impinges, the appropriate standard is strict scrutiny.

To date, the Supreme Court has not spoken on the precise issue and the lower federal courts have identified three standards of review with regard to juvenile curfews: rational basis, strict scrutiny, and intermediate scrutiny. Under the rational basis standard, no fundamental right is at issue and the District would only need to show a rational relationship between a juvenile curfew and any legitimate governmental interest: for instance, the need to stem juvenile violence and victimization in the District. *See City of Dallas v. Stanglin,* 490 U.S. 19, 25–28 & n. 4, 109 S.Ct. 1591, 1595–97 & n. 4, 104 L.Ed.2d 18 (1989). The rational basis standard is "true to the principle that the Fourteenth Amendment gives the federal courts no power to impose upon the States their views of what constitutes wise economic or social policy." *Id.* at 27, 109 S.Ct. at 1596 (quoting *Dandridge v. Williams,* 397 U.S. 471, 486, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 (1970)) (internal quotation marks omitted). By contrast, under a strict scrutiny standard, a fundamental right is implicated and the District would have to show that the Act is narrowly tailored to promote a compelling governmental interest. *See Plyler v. Doe,* 457 U.S. 202, 216–17, 102 S.Ct. 2382, 2394–95, 72 L.Ed.2d 786 (1982). To be narrowly tailored, there must be a sufficient nexus between the compelling governmental interest and the provisions of the Act, *see City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 493, 109 S.Ct. 706, 721–22, 102 L.Ed.2d 854 (1989), and the Act must use the least restrictive reasonable means to achieve its goals, *see Dunn v. Blumstein,* 405 U.S. 330, 343, 92 S.Ct. 995, 1003–04, 31 L.Ed.2d 274 (1972). A third standard, intermediate scrutiny, also acknowledges the existence of a fundamental right but gives recognition as well to the existence of important governmental interests where minors are involved; it requires a showing that the Act serves "important governmental objectives" and

that the means employed are "substantially related to the achievement of those objectives." *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982) (quoting *Wengler v. Druggists Mut. Ins. Co.*, 446 U.S. 142, 150, 100 S.Ct. 1540, 1545, 64 L.Ed.2d 107 (1980)) (internal quotation marks omitted) (gender); *see Plyler*, 457 U.S. at 225–30, 102 S.Ct. at 2398–2402 (illegal immigrant minors); *Lalli v. Lalli*, 439 U.S. 259, 265, 99 S.Ct. 518, 523, 58 L.Ed.2d 503 (1978) (plurality opinion of Powell, J.) (illegitimate children); *Carey v. Population Servs. Int'l*, 431 U.S. 678, 693 & n. 15, 97 S.Ct. 2010, 2020 & n. 15, 52 L.Ed.2d 675 (1977) (plurality opinion of Brennan, J.) (minor's right to obtain contraceptives). Described by one federal district court as a way to acknowledge both minors' claim to a fundamental right of free movement and the heightened interest of the government in protecting and fostering the development of its youth, *see Schleifer v. City of Charlottesville*, 963 F.Supp. 534, 540–42 (W.D.Va.1997) (denying preliminary injunction), intermediate scrutiny requires a showing of a "substantial" or "important" rather than a "compelling" governmental interest, *see Hogan*, 458 U.S. at 724, 102 S.Ct. at 3336; *Plyler*, 457 U.S. at 217–18, 224, 230, 102 S.Ct. at 2395, 2398, 2401–02; and of a substantial fit between means and ends rather than narrow tailoring, *see Hogan*, 458 U.S. at 724, 102 S.Ct. at 3336; *Lalli*, 439 U.S. at 265, 268, 99 S.Ct. at 523, 524–25. The first question, then, is which standard is appropriate for the evaluation of the Act, and as our separate

opinions indicate, there is more than one reasoned answer to this question.

Generally, legislation that treats one class of persons differently from others who are similarly situated is presumed to meet the equal protection requirements of the Fifth Amendment[9] if the classification drawn by the legislation is "rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439–40, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). If the classification disadvantages a "suspect class" or burdens one group's exercise of a "fundamental right," the legislation is subject to strict scrutiny review. *Plyler*, 457 U.S. at 216–17, 102 S.Ct. at 2394–95. Likewise, if a statute impinges upon a fundamental right, the substantive due process component of the Fifth Amendment requires that it satisfy strict scrutiny review.[10] *See Washington v. Glucksberg*, — U.S. —, 117 S.Ct. 2258, 2267–68, 138 L.Ed.2d 772 (1997). Because age does not determine a suspect class, *see Gregory v. Ashcroft*, 501 U.S. 452, 470, 111 S.Ct. 2395, 2406, 115 L.Ed.2d 410 (1991), the court must examine whether the Act threatens the minors' exercise of a fundamental right, thus demanding strict scrutiny review.

The Supreme Court has held that adults have a fundamental right to free movement,[11] and that minors have some fundamental rights entitled to constitutional protection.[12] At the same time, the Supreme Court recognizes the state's heightened interest in the protection of children, *see Prince v. Massa-*

---

9. Although the Equal Protection Clause, which provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws," U.S. CONST. amend. XIV, § 1, is in the Fourteenth Amendment, the Due Process Clause of the Fifth Amendment contains an equal protection component, *see Bolling v. Sharpe*, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954).

10. The requirements of the Fifth Amendment Due Process Clause apply to the District of Columbia. *See Bolling*, 347 U.S. at 499, 74 S.Ct. at 694.

11. *See, e.g., Kolender v. Lawson*, 461 U.S. 352, 358, 103 S.Ct. 1855, 1858–59, 75 L.Ed.2d 903 (1983); *Dunn*, 405 U.S. at 338, 92 S.Ct. at 1001; *Papachristou v. City of Jacksonville*, 405 U.S. 156, 164, 92 S.Ct. 839, 844, 31 L.Ed.2d 110 (1972);

*Aptheker v. Secretary of State*, 378 U.S. 500, 520, 84 S.Ct. 1659, 1671, 12 L.Ed.2d 992 (1964) (Douglas, J., concurring); *Kent v. Dulles*, 357 U.S. 116, 125, 78 S.Ct. 1113, 1118, 2 L.Ed.2d 1204 (1958); *United States v. Wheeler*, 254 U.S. 281, 293, 41 S.Ct. 133, 134, 65 L.Ed. 270 (1920).

12. *See, e.g., Reno v. Flores*, 507 U.S. 292, 315–16, 113 S.Ct. 1439, 1454–55, 123 L.Ed.2d 1 (1993) (O'Connor, J., concurring); *Hodgson v. Minnesota*, 497 U.S. 417, 434–35, 110 S.Ct. 2926, 2936–37, 111 L.Ed.2d 344 (1990); *Planned Parenthood of Central Mo. v. Danforth*, 428 U.S. 52, 74, 96 S.Ct. 2831, 2843, 49 L.Ed.2d 788 (1976); *Goss v. Lopez*, 419 U.S. 565, 574, 95 S.Ct. 729, 736, 42 L.Ed.2d 725 (1975); *Tinker v. Des Moines Indep. Community Sch..Dist.*, 393 U.S. 503, 506, 511, 89 S.Ct. 733, 736, 739, 21 L.Ed.2d 731 (1969); *In re Gault*, 387 U.S. 1, 13, 87 S.Ct. 1428, 1436, 18 L.Ed.2d 527 (1967).

chusetts, 321 U.S. 158, 168–69, 64 S.Ct. 438, 443–44, 88 L.Ed. 645 (1944); *Bellotti v. Baird*, 443 U.S. 622, 635, 99 S.Ct. 3035, 3043–44, 61 L.Ed.2d 797 (1979) (plurality opinion of Powell, J.), and acknowledges that "if parental control falters, the State must play its part as *parens patriae*," *Schall v. Martin*, 467 U.S. 253, 265, 104 S.Ct. 2403, 2410, 81 L.Ed.2d 207 (1984). There is obvious tension between the propositions that there is a fundamental right to free movement and that minors possess some fundamental rights, and the proposition that the state has a greater interest in protecting minors than adults. So far, the Supreme Court has not explained how the tension is to be resolved with regard to juvenile curfews. Indeed, the Court has acknowledged that "[t]he question of the extent of state power to regulate conduct of minors not constitutionally regulable when committed by adults is a vexing one, perhaps not susceptible of precise answer." *Carey*, 431 U.S. at 692, 97 S.Ct. at 2020 (plurality opinion of Brennan, J.). Further, the Supreme Court has emphasized that courts must be "reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights*, 503 U.S. 115, 125, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992).

It is instructive that in a variety of contexts, the Supreme Court has distinguished between minors' and adults' constitutional rights. For instance, in *Prince*, while rejecting a challenge under the First and Fourteenth Amendments to a state statute prohibiting minors from selling merchandise on public streets, the Supreme Court explained:

The state's authority over children's activities is broader than over like actions of adults. This is peculiarly true of public activities and in matters of employment. A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens, with all that implies. It may secure this against impeding restraints and dangers within a broad range of selection. Among evils most appropriate for such action are the ... possible harms arising from ... activities subject to all the diverse influences of the street. It is too late now to doubt that legislation appropriately designed to reach such evils is within the state's police power, whether against the parent's claim to control of the child or one that religious scruples dictate contrary action.

It is true children have rights, in common with older people, in the primary use of highways. But even in such use streets afford dangers for them not affecting adults. And in other uses ... this difference may be magnified. This is so not only when children are unaccompanied but certainly to some extent when they are with their parents. What may be wholly permissible for adults therefore may not be so for children, either with or without their parents' presence.

*Prince*, 321 U.S. at 168–69, 64 S.Ct. at 443 (footnotes omitted).

The state's greater authority over minors' conduct is similarly reflected in *Ginsberg v. New York*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968), where the Court, applying a rational basis standard to uphold a state statute banning the sale to minors of obscene materials, allowed New York to adjust the definition of obscenity for minor readers. *See id.* at 637–38, 88 S.Ct. at 1279–80. The same approach is reflected in the lines that the Court has drawn between adults' and minors' due process rights: while the government's burden of proof remains the same for both adult prosecutions and juvenile delinquency proceedings, *see In re Winship*, 397 U.S. 358, 368, 90 S.Ct. 1068, 1074–75, 25 L.Ed.2d 368 (1970), and a minor has a right to counsel, a right to cross-examine witnesses, and a privilege against self-incrimination, *see In re Gault*, 387 U.S. 1, 36–37, 55–57, 87 S.Ct. 1428, 1448–49, 1458–59, 18 L.Ed.2d 527 (1967), a minor does not have a right to a jury trial in juvenile delinquency proceedings analogous to an adult's right in a criminal prosecution, *see Kent v. United States*, 383 U.S. 541, 555, 86 S.Ct. 1045, 1054, 16 L.Ed.2d 84 (1966). Similarly, although a state may not impose a blanket parental consent requirement for a minor to obtain an abortion, the Court has emphasized that this conclusion does "not suggest that every minor, regardless of age or maturity,

may give effective consent for termination of her pregnancy," despite adults' possession of such a right. *Planned Parenthood of Central Mo.,* 428 U.S. at 74–75, 96 S.Ct. at 2844. Generally, the line-drawing reflects the analysis of the plurality in *Bellotti;* in striking down a parental-consent statute as unduly burdensome on a minor's constitutional right to have an abortion, the plurality identified three factors, any one of which would suffice, justifying state action treating minors differently from adults in regard to constitutional protections: (1) "the peculiar vulnerability of children"; (2) children's "inability to make critical decisions in an informed, mature manner"; and (3) "the importance of the parental role in child rearing."[13] *Bellotti,* 443 U.S. at 634, 99 S.Ct. at 3043 (plurality opinion of Powell, J.).

Further, the Supreme Court has concluded that the distinction between adults' and minors' constitutional rights applies with regard to certain rights to free movement. In *Vernonia School District 47J v. Acton,* 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995), the Court upheld a random urinalysis requirement for high school athletes against a Fourth Amendment challenge because the requirement was reasonable in light of the minimal legitimate expectations of privacy of students committed to the temporary custody of a schoolmaster, in particular those who join a school sports team and agree to change and shower in public locker rooms, to submit to preseason physical exams, to sign insurance waivers, to maintain minimum grades, and to comply with rules of conduct, dress, and training hours. *See id.* at 654–57, 664–65, 115 S.Ct. at 2391–93, 2396–97; *cf. Tinker v. Des Moines Indep. Community Sch. Dist.,* 393 U.S. 503, 507, 89 S.Ct. 733, 736–37, 21 L.Ed.2d 731 (1969). In so doing, the Court observed:

> Traditionally at common law, and still today, unemancipated minors lack some of the most fundamental rights of self-determination—including even the right of liberty in its narrow sense, *i.e., the right to come and go at will.* They are subject, even as to their physical freedom, to the control of their parents or guardians. When parents place minor children in private schools for their education, the teachers and administrators of those schools stand *in loco parentis* over the children entrusted to them.

*Vernonia Sch. Dist. 47J,* 515 U.S. at 654, 115 S.Ct. at 2391 (citation omitted) (emphasis added). Likewise, in *Reno v. Flores,* 507 U.S. 292, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993), the Court upheld an Immigration and Naturalization Service regulation allowing juvenile aliens detained pending deportation hearings to be released only to the custody of their parents, close relatives, or legal guardians, with the observation that " 'juveniles, unlike adults, are always in some form of custody,' and where the custody of the parent or legal guardian fails, the government may (indeed, we have said *must*) either exercise custody itself or appoint someone else to do so." *Id.* at 302, 113 S.Ct. at 1447 (quoting *Schall,* 467 U.S. at 265, 104 S.Ct. at 2410) (citation omitted). Under these precedents, were the Supreme Court to hold that minors have the same fundamental right of movement as adults, it would have to jettison long-settled views on the distinct and yet at times concurrent roles of parents and the state, views that render some types of interference with free movement constitutionally permissible for minors even if not for adults.

Faced with the dilemma of what standard of scrutiny to employ in reviewing statutes that affect minors' privacy rights, the Supreme Court recognized the fundamental right of privacy that minors have in decisions affecting procreation while nonetheless applying a less rigorous test than strict scrutiny in examining whether a "significant state interest" justified the parental consent provision at issue. *Planned Parenthood of Central Mo.,* 428 U.S. at 75, 96 S.Ct. at 2843–44. Soon thereafter a Supreme Court plurality

---

**13.** These factors have not proven decisive, however, as courts have differed about their meaning and application. *Compare Schleifer,* 963 F.Supp. at 542 ("[T]he *Bellotti* factors justify a less stringent standard of review in this case."), *and City of Panora v. Simmons,* 445 N.W.2d 363, 368–69 (Iowa 1989) (en banc) (same), *with Johnson,* 658 F.2d at 1073 (concluding that the *Bellotti* factors did not justify a lessened standard of review); *Nunez,* 114 F.3d at 945–46 (same); *and Waters v. Barry,* 711 F.Supp. 1125, 1136–37 (D.D.C.1989) (same). This difference is reflected in my opinion and that of Judge Tatel.

explained that intermediate scrutiny "is appropriate both because of the States' greater latitude to regulate the conduct of children and because the right of privacy implicated here is 'the interest in independence in making certain kinds of important decisions,' and the law has generally regarded minors as having a lesser capability for making important decisions." *Carey*, 431 U.S. at 693 n. 15, 97 S.Ct. at 2020 n. 15 (plurality opinion of Brennan, J.) (quoting *Whalen v. Roe*, 429 U.S. 589, 599–600, 97 S.Ct. 869, 876–77, 51 L.Ed.2d 64 (1977)) (citations omitted). The approach reflected in the intermediate scrutiny test fits comfortably in examining the rights affected by juvenile curfews. That minors have a fundamental right of movement in some regard, the nature of which admittedly is not precisely defined, is necessarily implied in the Court's decisions explaining circumstances in which that right is properly restricted. An intermediate scrutiny standard thus recognizes that in some circumstances, courts are compelled to equate the constitutional rights of minors and adults, and in other instances they are not. *Compare Gault*, 387 U.S. at 36–37, 55–57, 87 S.Ct. at 1448–49, 1458–59, *with Kent*, 383 U.S. at 555, 86 S.Ct. at 1054. Viewed in light of factors deemed to be significant in both *Carey* and *Bellotti*, juvenile curfews arise in a context in which children are more vulnerable than adults, *see Prince*, 321 U.S. at 168–69, 64 S.Ct. at 443–44, and in which children's lesser ability to make important decisions wisely could cause them harm. As the district court in *Schleifer* explained, "[o]f course, on an isolated night, a decision to go out after curfew hours may not be a critical decision, but rather one of minimal importance; but that decision, made night after night, might have an adverse effect on a child's life." *Schleifer*, 963 F.Supp. at 542.

Consequently, because minors have certain constitutional rights that may include a right of movement under some circumstances, but the government also has interests that may override or infringe upon those rights, and because minors are generally more vulnerable on the street at night than adults, but might not be as able to make intelligent decisions about their outdoor late-night activities, an intermediate scrutiny standard should apply in examining the minor appel-

lees' challenges to the Act. While Judge Tatel expresses concern that such a standard may impinge unnecessarily on minors' right of movement, *see* concurring opinion, *infra* at 825–826, he agrees that the government's special interest in and authority over children cannot be ignored, *see id.* at 825, 826. Consequently, his strict scrutiny test must give way in some respect in order to give effect and meaning to the governmental interest. In the end, he would redefine the strict scrutiny test to give special emphasis to the importance of minors' right of movement, and this is already accomplished by the intermediate scrutiny standard. Certainly in the instant case, where all agree that the District has demonstrated a compelling interest in reducing juvenile crime and victimization, the only question is whether the means are sufficiently tailored to respect minor's rights and to remedy the problems. Yet were the bar placed so high that virtual scientific certainty would be required to demonstrate that all other alternatives have proved insufficient, as is implied in Judge Tatel's analysis, *see infra* concurring opinion at 826–27 (calling for curfew laws that are "more effective" than other alternatives), the government would be stymied in its efforts to protect juveniles from serious or even deadly harm notwithstanding evidence that other communities have successfully implemented juvenile curfews. Such an approach appears inconsistent with Supreme Court teaching that when parental control fails to provide adequate protection or is absent, the government may intervene, as for example, in *Prince*, where even though a parent had given permission to a child to act in a certain manner, the government could preclude such action, and in *Flores*, where the government could restrict minors' release to certain persons, and in *Vernonia*, where parents were deemed to have designated school officials to act *in loco parentis* where their children's Fourth Amendment rights were at stake.

The intermediate scrutiny standard, properly understood, does not diminish the importance of the rights at issue, but does acknowledge that the government may have important interests as well, and thus the analysis under intermediate scrutiny will be demanding in its requirement that the means

are *"substantially* related" to achievement of the identified objectives. The instant case illustrates the point. Under the intermediate scrutiny standard, a statute "must serve important governmental objectives and must be substantially related to the achievement of those objectives." *Craig,* 429 U.S. at 197, 97 S.Ct. at 457. As described in sections III.B & C, although the Act undoubtedly serves an important governmental goal, its "relation to the state interests it is intended to promote is so tenuous that it lacks the rationality contemplated by the [requirement of equal protection]," *Lalli,* 439 U.S. at 273, 99 S.Ct. at 527, causing it to fail the intermediate scrutiny test.

### B.

The first prong of the intermediate scrutiny test is not at issue because the District has doubtless shown an important interest in reducing juvenile crime and victimization sufficient to satisfy an intermediate scrutiny review. The District's interest in enacting a juvenile curfew, as stated in the Act, is to reduce juvenile crime and victimization and to aid parents or guardians "in carrying out their responsibility to exercise reasonable supervision of minors." D.C.CODE § 6–2181(e)(1)–(3) (Supp.1997). The Supreme Court has recognized that the state has a "legitimate and compelling" interest in protecting the entire community, including juveniles, from crime. *Schall,* 467 U.S. at 264, 104 S.Ct. at 2409–10 (quoting *DeVeau v. Braisted,* 363 U.S. 144, 155, 80 S.Ct. 1146, 1152, 4 L.Ed.2d 1109 (1960)) (internal quotation marks omitted). It has further recognized that the state "has a strong and legitimate interest in the welfare of its young citizens, whose immaturity, inexperience, and lack of judgment may sometimes impair their ability to exercise their rights wisely." *Hodgson v. Minnesota,* 497 U.S. 417, 444,

110 S.Ct. 2926, 2942, 111 L.Ed.2d 344 (1990). Every federal court to reach this issue in the context of a juvenile curfew statute has found or assumed there to be a compelling state interest in protecting the safety and well-being of children and in reducing juvenile crime.[14]

If ever there were a place with an important need to reduce juvenile crime and victimization, it is the District of Columbia. The district court considered the 1995 *Kids Count Data Book,*[15] which indicates that in 1992, the District of Columbia's violent crime arrest rate for youths aged ten to seventeen was the worst in the nation, and more than three times the national average, at 1,487 violent crime arrests per 100,000 youths. *See id.* at 49. The District of Columbia also had the worst violent death rate in the nation for teens aged fifteen to nineteen; the District's rate of 269 violent deaths per 100,000 teens was more than four times the national average. *See id.* Moreover, the problem was worsening: according to statistics from the Juvenile Division of the Office of the Corporation Counsel, between 1987 and 1995, juvenile arrests for aggravated assault increased by 89.8%, for murder by 157%, and for carrying a dangerous weapon by 282.7%. Also, the number of referrals to court for juveniles "in need of supervision"[16] increased by 181.9% between 1990 and 1994. In addition to statistical evidence prepared by the executive and judicial branches of the District government, the D.C. Council received statistics from an opponent of the curfew legislation that showed an alarming number of murders, shootings, and assaults during curfew hours in areas covered by the curfew, although the ages of the perpetrators are not identified and most of the incidents involving minor victims did not occur during curfew hours. Further, elected representatives of

14. *See Nunez,* 114 F.3d at 946–47 (9th Cir.); *Qutb,* 11 F.3d at 492 (5th Cir.); *Schleifer,* 963 F.Supp. at 543 (W.D.Va.); *Hutchins,* 942 F.Supp. at 674 (D.D.C.); *Waters,* 711 F.Supp. at 1139 (D.D.C.).

15. ANNIE E. CASEY FOUNDATION, KIDS COUNT DATA BOOK· STATE PROFILES OF CHILD WELL-BEING (1995).

16. The term "child in need of supervision" means a [person under the age of eighteen] who—

(A)(i) subject to compulsory school attendance and habitually truant from school without justification;

(ii) has committed an offense committable only by children; or

(iii) is habitually disobedient of the reasonable and lawful commands of his parent, guardian, or other custodian and is ungovernable; and

(B) is in need of care or rehabilitation.

D.C.CODE § 16–2301(8).

Advisory Neighborhood Commissions ("ANCs") and other District residents testified before the D.C. Council about violence plaguing the streets, gunfire from early evening through early morning, children counting the new bullet holes every morning in the doors to their kindergartens, the worsening of teen violence, the gang victimization of youths, and murder becoming sport.[17] Finally, upon removing the sunset provision of the Act, see supra note 4, the D.C. Council had new evidence that juvenile violence was "ever-increasing" and juvenile victimization was "skyrocketing." [18]

Although the evidence upon which the D.C. Council relied was flawed, see infra subsection III.C., it nevertheless reflects a serious problem with juvenile crime and victimization in the District of Columbia. A district court in a neighboring jurisdiction observed that "the crime rate by juveniles in the District of Columbia is staggering by any definition."

Schleifer, 963 F.Supp. at 546. Because the District presented ample evidence that juvenile crime and victimization are crushing problems for the District of Columbia, it has demonstrated an important government interest sufficient to meet the first prong of intermediate scrutiny review.[19]

### C.

Whether the District has demonstrated that the Act survives the second prong of the intermediate scrutiny standard is more problematic. Under intermediate scrutiny, the Act must be "substantially related" to the goals of reducing juvenile crime and victimization. By requiring a very close relationship between purpose and remedy, the court ensures that the legislature enacted its juvenile curfew on the basis of reasoned analysis rather than assumptions. See Hogan, 458 U.S. at 725–26, 102 S.Ct. at 3336–37; cf. Wengler, 446 U.S. at 151–52, 100 S.Ct. at

---

17. Observing that the findings and purpose in the bill as introduced are "vague and unclear," one ANC Commissioner implored the D.C. Council to:

Please state what the increase in juvenile violence was over a two or three year period. Please state the number of known gangs that are "raping" lives in the District of Columbia. Please state the type of violent, criminal activity these gangs partake in. State the crimes, state the atrocities. Include in this statement the measurable impact to the District of Columbia, i.e., has incidence of teen pregnancy, welfare dependency, school truancy, alcoholism, sexually transmitted diseases increased proportionately. If so, state this. The cost of these social ills is a burden on all the residents of the District of Columbia. The findings and purpose must be depicted with candor. Make it clear that we are fighting a "war." No one should be able to question the grave need for this legislation.

18. At the D.C. Council Legislative Meeting of September 22, 1997, Councilmember Brazil stated:

The 1997 Kids Count Data Book reports that as of 1994, the District of Columbia's teen violent-death rate was higher than any other state, was nearly five times higher than the national average and was more than triple the next-worst states.
Between 1985 and 1994, the District's teen violent-death rate increased by 669 percent. Further report indicates that as of 1994, the District's juvenile violent-crime arrest rate was also higher than any other state's, was more

than triple the national average and was over 50 percent higher than the next-worst states. The report also reflects that the District ranks last, below every state, in the overall measure of children's well being.
Further, the report indicates that the District of Columbia courts, in their report, shows that juvenile criminal activity ... increased in the District by nearly 47 percent between the years 1994 and 1995.
And, finally, the 1995 Juvenile Arrests Bulletin from the U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention[,] reports that in 1995 the District's juvenile violent-crime index was nearly triple the national average and was nearly 50 percent higher than the next-worst states.

See ANNIE E. CASEY FOUNDATION, KIDS COUNT DATA BOOK: STATE PROFILES OF CHILD WELL-BEING (1997). We take judicial notice, see Nantucket Investors II, 61 F.3d at 205, of a recent press report, in which a 1997 Kids Count demographer described the juvenile victimization situation in the District by observing that, while the violent death rate for young people nationwide tends to reflect many more accidents than homicides, "D.C. is different.... Not that many kids drive. On the other hand, a lot more die in homicides." DeNeen L. Brown, Death Rates for Children Rise in D.C., WASH. POST, May 5, 1997, at B01 (quoting demographer William P. O'Hare).

19. Appellees conceded in the district court and in their briefs on appeal and the district court found that the District had demonstrated a compelling interest under the more stringent strict scrutiny standard. See Hutchins, 942 F.Supp. at 674.

1545–46; *Carey,* 431 U.S. at 696, 97 S.Ct. at 2022 (plurality opinion of Brennan, J.). The Supreme Court instructs that the court must conduct a "searching analysis" in order to make sure that the legislature has provided sufficient justification for the statute's key provisions. *Hogan,* 458 U.S. at 728, 102 S.Ct. at 3338. At this point, the District has failed to provide the necessary justification and the Act thus fails intermediate scrutiny analysis.

Were the rational basis test applied, the Act would undoubtedly pass muster because the District's curfew regime is unquestionably rationally related to its goals of reducing juvenile crime and violence. By requiring that minors in public during curfew hours be accompanied by an adult, the D.C. Council reasonably assumed that adults will normally protect minors in their care and prevent them from victimizing others.[20] In addition, the experience of other jurisdictions facing increases in juvenile crime and victimization indicated to the D.C. Council that a curfew can be a useful tool in fighting such problems. Reports on the specific experiences of Dallas and San Antonio, Texas, and New Orleans, Louisiana, showed that after a juvenile curfew became effective, the number of juvenile arrests for violent offenses decreased, and the Dallas and San Antonio reports also showed reductions in juvenile victimization. The D.C. Council could properly rely on studies by other cities so long as there was a reasonable basis on which to conclude that the studies were relevant. *See City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 51–52, 106 S.Ct. 925, 930–31, 89 L.Ed.2d 29 (1986).

Testimony before the D.C. Council further confirms that the Act is rationally related to the governmental interest in reducing juvenile crime and victimization. From the law enforcement community, the D.C. Council heard, through a representative of the Community Branch of Community Policing who has taken "ride-alongs" with the Metropolitan Police Department, that the juvenile curfew is "an important tool," although "not an all-inclusive cure," because "it disrupts the gang activity, the drug trade, the hanging out waiting for the right opportunity to commit the crime. It also removes potential drive-by victims from public places where they can be targets." The D.C. Council also received statistical information and reports from the Police Chief on the anticipated effect of a curfew statute. Following enactment of the curfew regime, in one of several reports on implementation of the Act, the Police Chief emphasized the value of the curfew in addressing the problems of truancy and runaways—early indicia of later criminal activity and victimization—and reported on juvenile arrests for violent offenses during curfew hours. In addition, an expert testified in the district court on the nature of peer pressure, opining that the large majority of delinquent acts committed by minors occur when minors are in the company of other minors, without adult supervision, and that, consequently, a curfew would reduce the number of such acts both by decreasing the amount of time minors are unsupervised and by encouraging parental supervision. The Act would certainly pass rational basis review.

Just as certainly, however, the evidence offered by the District to demonstrate that the curfew regime would accomplish its purposes is inadequate to survive strict scrutiny review. As the district court found, the District provided "only scant statistical information on crime in the District committed by and against minors under the age of seventeen." *Hutchins,* 942 F.Supp. at 675 (emphasis omitted). Such information as it provided was further flawed both because the statistics included persons up to age eighteen

---

**20.** Notwithstanding local court statistics indicating an increase in the number of child abuse cases from 1984 to 1991, *see* DISTRICT OF COLUMBIA COURTS, 1991 ANNUAL REPORT tbl. 22 (1991), the D.C. Council could reasonably proceed on the assumption that a child is protected from physical dangers while at home during the late night and early morning hours. *See People v. Chambers,* 66 Ill.2d 36, 4 Ill.Dec. 308, 360 N.E.2d 55, 57 (1976). To conclude otherwise would leave the District in a never-never-land in which, to responsibly protect District youth, it would have to confine them until they reached maturity. Such a conclusion would be both preposterous and unnecessary given other laws protecting juveniles, including the criminal law and the laws against child abuse and neglect. *See* D.C.CODE §§ 6–2101 to –2138, 22–101 to –4124 (Repl. Vols. 1995 & 1996 & Supp.1997).

and because they did not show the time when incidents occurred, or the ages of the perpetrators or victims, or the places where incidents occurred. *See id.* at 675–76. As the district court noted, a chart of juvenile arrests during curfew hours prepared by the Metropolitan Police Department was over-inclusive because it contained data on minors over age seventeen, was undated, and lacked corroboration from either its author, who was unidentified, or someone familiar with the methodology used to prepare the report. *See id.* at 677. The legislature did not act on evidence sufficient to withstand strict scrutiny review.

So too, the District failed to provide evidence of sufficient quality to support the Act under intermediate scrutiny review. Although the inquiry into the evidentiary basis for a legislature's impingement of constitutional rights may be somewhat less probing under intermediate scrutiny than under strict scrutiny to the extent that recognition must be given of the heightened governmental interest, the inquiry is still a serious one for a "substantial relat[ion]" must be demonstrated between means and purposes. Where statistical data is employed to justify the salient features of a statute, the court must ensure that the data shows that the "fit" between the statute and its goals is clear, and not "unduly tenuous." *Craig,* 429 U.S. at 200–03, 97 S.Ct. at 458–60. Statistics establishing broad propositions may not suffice under the intermediate scrutiny test. Thus, in *Craig,* the Supreme Court held that flawed or only slightly relevant statistical studies could not form the basis for the use of gender as a classifying device. *See id.* at 200–04, 97 S.Ct. at 458–61. In that case, the Court concluded that the statistical studies offered by the state, while graphically documenting the problem of underage driving while intoxicated, related little to the statute's key provisions, which barred consumption of alcohol by men but not women aged eighteen to twenty. *See id.* at 191–92, 202–

03, 97 S.Ct. at 453–54, 459–60. Although courts must acknowledge that "matters of practical judgment and empirical calculation are for" the executive and legislative branches of government, since "the precise accuracy of [the state's] calculations is not a matter of specialized judicial competence," the court still must insist on "consistency and substantiality" in the evidentiary data relied on by the state to establish a sufficient fit between its means and goals. *Lalli,* 439 U.S. at 274, 99 S.Ct. at 527–28 (plurality opinion of Powell, J.) (quoting *Mathews v. Lucas,* 427 U.S. 495, 516, 96 S.Ct. 2755, 2767, 49 L.Ed.2d 651 (1976)) (internal quotation marks omitted).

Admittedly, it may not always be clear how closely a court engaging in intermediate scrutiny should probe the legislature's evidentiary findings. Most of the Supreme Court's decisions involving this standard outside of the First Amendment context have involved statutes or other state actions that have discriminated on the basis of gender rather than age; moreover, one Justice has questioned whether the Court is applying intermediate scrutiny according to its original terms in gender cases.[21] *See United States v. Virginia,* 518 U.S. 515, 568–77, 594–98, 116 S.Ct. 2264, 2293–96, 2305–06, 135 L.Ed.2d 735 (1996) (Scalia, J., dissenting).[22] Even without direct Supreme Court guidance, however, in the instant case it is clear that wherever the precise boundaries of the evidentiary nexus test under intermediate scrutiny are set, the evidentiary record supporting the Act does not satisfy them.

The evidentiary flaws identified by the district court illustrate how the District failed to show that the Act is "substantially related" to the District's goals. The first statistical problem is age-related, age being a key part of the curfew regime. The District's statistics on juvenile arrests and referrals to court for juveniles "in need of supervision," while indicating disturbing trends for all youths, are flawed in that they include youths aged

---

21. Applying intermediate scrutiny in the context of a parental consent provision in an abortion statute, the Court did consider the legislature's contention that this provision was likely to serve the interest of "safeguarding of the family unit and of parental authority." *Planned Parenthood of Central Mo.,* 428 U.S. at 75, 96 S.Ct. at 2844. The Court refused to conclude that the means of

the parental consent provision .were related closely enough to the ends of family unity and parental authority, *see id.,* but the brief analysis in this opinion provides little guidance.

22. *See also* Cass R. Sunstein, *The Supreme Court, 1995 Term—Foreword: Leaving Things Undecided,* 110 Harv. L.Rev. 4, 75, 77– 78 (1996).

seventeen. *See id.* at 675; *see also* D.C.CODE § 16–2301(3). As the annual reports of the D.C. courts show, youths aged seventeen and older were responsible for 42% of juvenile referrals for the years 1990 through 1994;[23] a curfew excluding this group lacks a close fit to the goal of reducing juvenile crime.[24] Further, although the District's statistics indicate that its teen violent death rate was skyrocketing, those statistics pertain to youths aged fifteen to nineteen, *see supra* section III.B; because these statistics do not indicate what percentage of those dying are youths aged seventeen to nineteen, and thus unaffected by the curfew, the statistics offer only weak evidence that the curfew will much reduce the teen violent death rate.

The second statistical problem is temporal, time also being a key provision of the curfew regime. While the District's data on teen violent death demonstrate a devastating trend, neither they, nor the District's national teen victimization data,[25] indicate what time of day or night minors are victimized. Uncontested evidence in the record indicates that most juvenile victimization nationwide occurs shortly after school, around 3:00 or 4:00 p.m.[26] In addition, recent data from the Federal Bureau of Investigation shows that juvenile crime peaks between 3:00 and 8:00 p.m.[27] The only chart before the D.C. Council addressing the time of day juvenile crime occurs, which indicates that half of juvenile arrests occur during curfew hours, was contradicted by other evidence before the dis-

trict court and, even taken on its own terms, is flawed in that it also includes seventeen-year-olds, who will not be affected by the curfew. *See Hutchins,* 942 F.Supp. at 677. Further, the District's data do not indicate where juveniles are victimized or where juvenile crime occurs. If a substantial percentage of juvenile victimization and crime occurs within schools, homes, or youth recreation centers, a curfew that does not pertain to those locations will be of little assistance.

The faults in the District's juvenile crime and victimization data are not cured by other record evidence. The Police Chief's report that juvenile arrests for violent offenses declined during three of the months when the curfew was in effect[28] is weakened by evidence that during those three months, the police budget and the size of the force were reduced, and limitations were placed on police overtime, which would logically suggest an alternate cause for the reduction in arrests. *See id.* at 676. No contrary conclusion was suggested in the record, as the District did not present expert testimony on this point. *Cf. Schleifer,* 963 F.Supp. at 545. Although properly gathered statistics might show that juvenile crime decreased even while police resources were, hypothetically, held constant, no such statistics are in the record. While the D.C. Council could properly rely on the experiences of other jurisdictions as evidence of the efficacy of juvenile curfews in general, *see Renton,* 475 U.S. at 51–52, 106 S.Ct. at 930–31, the District pre-

**23.** *See* DISTRICT OF COLUMBIA COURTS, 1994 ANNUAL REPORT tbl. 31 (1994); DISTRICT OF COLUMBIA COURTS, 1993 ANNUAL REPORT tbl. 31 (1993); DISTRICT OF COLUMBIA COURTS, 1992 ANNUAL REPORT tbl. 29 (1992); DISTRICT OF COLUMBIA COURTS, 1991 ANNUAL REPORT tbl. 24 (1991); DISTRICT OF COLUMBIA COURTS, 1990 ANNUAL REPORT tbl. 27 (1990).

**24.** The 42% statistic understates the percentage of older youths responsible for violent juvenile crime because the D.C. Court's juvenile referral statistics do not even include youths prosecuted as adults because they are sixteen years of age or older and are "charged by the United States attorney with … murder, first degree sexual abuse, burglary in the first degree, robbery while armed, or assault with intent to commit any such offense." D.C.CODE § 16–2301(3)(A)(i).

**25.** *See* OFFICE OF JUVENILE JUSTICE AND DELINQUENCY PREVENTION, U.S. DEP'T OF JUSTICE, FACT SHEET No. 17, JUVENILE VICTIMIZATION· 1987–1992 (1994).

**26.** *See* Deposition of Jeffrey A. Butts.

**27.** *See* James Alan Fox & Sanford A. Newman, *Fight Crime: Invest in Kids, After–School Crime or After–School Programs* (visited Mar. 4, 1998) <http://fightcrime.org/CrimeReportF15.html>. President Clinton referred to this conclusion in his most recent State of the Union address. *See This Is Not a Time to Rest. It Is a Time to Build,* WASH. POST, Jan. 28, 1998, at A24 (text of State of the Union address).

**28.** After the Act had been in effect for three months, the Police Chief informed the D.C. Council that "[t]he juvenile curfew has made a significant impact on the District's youth arrest rate," noting a decrease of 39% in the arrest rate for more serious offenses and a 34% decrease over all.

sented no evidence that those other jurisdictions are sufficiently similar to the District of Columbia that a curfew designed like theirs will produce similar results here; indeed, specialized programs elsewhere may have also been a cause for other curfews' success, but the District offered no evidence either that the District has similar programs or that the absence of similar programs is insignificant.[29] Without some evidentiary explanation for discrepancies, the District is impermissibly relying on bare assumptions. *Cf. Hogan,* 458 U.S. at 725–26, 102 S.Ct. at 3336–37; *Wengler,* 446 U.S. at 151–52, 100 S.Ct. at 1545–46; *Carey,* 431 U.S. at 696, 97 S.Ct. at 2022 (plurality opinion of Brennan, J.). Because the flaws in the legislative record pertain to such fundamental features of the curfew—the age of those covered and the hours of coverage—the court has no choice but to conclude that it cannot presume that the D.C. Council was acting in a sufficiently precise and reasoned fashion to withstand intermediate scrutiny.[30]

Courts upholding similar curfews, albeit under a strict scrutiny standard, were not confronted with evidentiary deficiencies of this dimension. As the district court pointed out, the city of Dallas offered, in support of its curfew, evidence that juvenile crime increases proportionally with age between ten years old and sixteen years old, and evidence of the times of day and the places in which violent crime by all perpetrators occurs. *See Hutchins,* 942 F.Supp. at 679 (citing *Qutb,* 11 F.3d at 493). Although the city of Dallas was unable to provide data concerning the precise number of juveniles arrested or victimized during curfew hours, its data demonstrated a closer fit between its curfew and its goals because it at least included specific statistics concerning the age group affected by the curfew and about the times and places in which minors, as well as other victims,

most commonly fall prey to violent crimes. *See Qutb,* 11 F.3d at 493 & n. 7.

Similarly, the city of Charlottesville, Virginia, presented expert evidence describing national trends in juvenile crime and victimization, and confirming that Charlottesville's trends mirrored the national data and that the curfew law in Charlottesville was among the most modest and lenient nationwide. *See Schleifer,* 963 F.Supp. at 544. The Charlottesville Commonwealth Attorney supported the expert's testimony with data on juvenile crime in Charlottesville showing that the most serious crimes occur during nighttime hours, and explaining the link between the national statistics and juvenile crime and victimization in Charlottesville. *See id.* at 544–45. The Commonwealth Attorney also explained at a public hearing why the inclusion of seventeen-year-olds in crime and victimization data did not distort the statistics. *See id.* at 545. In addition, the city offered evidence comparing the incidents of violent crime during curfew and non-curfew hours and expert testimony that juveniles face more dangers during curfew hours than during the day. *See Schleifer v. City of Charlottesville,* 992 F.Supp. 823, 825–26 (W.D.Va. 1997) (denying permanent injunctive relief). The city further demonstrated, to the satisfaction of the district court, that there was "considerable and careful deliberation and extensive research" underlying the enactment of the curfew. *Id.*

By contrast, the District offered no expert testimony explaining why the inclusion of seventeen-year-olds in crime data did not distort the data's relevance to a curfew applying to youths under the age of seventeen. Nor did the District offer an explanation for plainly contradictory statistics; although reasonable explanations of the discrepancies might exist, in their absence, the statistics appear largely meaningless.[31] Unlike either

---

29. For example, a study showed that juvenile crime in Dallas dropped 26% following expansion of recreational opportunities for young people. *See* Eric Lotke & Vincent Schiraldi, *An Analysis of Juvenile Homicides* 14 (visited Mar. 4, 1998) <http://www.ncianet.org/ncia/waiver.html>.

30. None of the supplementary material in the Report of the Judiciary Committee of the D.C.

Council on the Juvenile Curfew Amendment Act of 1998 (Feb. 25, 1998) alters this conclusion.

31. The chart of juvenile arrests statistics from Fiscal Years 1994 and 1995 provided by the Police Chief indicated 1,320 serious ("part I") offenses committed by juveniles in FY 1994, during all hours combined. *See* Letter from Larry D. Soulsby, Chief of the Metropolitan Police Department, to William P. Lightfoot, Chairperson of

Dallas or Charlottesville, the District also did not provide evidence of the places where violent crimes are likely to occur. Nor did the District provide expert testimony to explain the link between national and local statistics, or to explain the enhanced risks youths face in public at night.

Crafting a constitutional curfew is not an easy task. The tensions between minors' rights and governmental interests are interwoven and complex. Some of the "defenses" in the Act cause gaps that would appear to undermine achievement of the results sought by the District: a juvenile can be attacked even while running errands without detour or stop, exercising First Amendment rights, returning home from city-sponsored events, or, for that matter, being married. Yet filling these gaps would place greater restraints on movement than the Act imposes, and such "defenses" or exceptions have proven important to courts analyzing a curfew's constitutionality.[32] In one sense, this paradox might lead to the conclusion that the close-fit requirement for curfews may always prove insufficiently precise. But even if the problem is vexing, courts have not suggested that a "sufficiently related" nexus cannot be achieved in a statute, much less that, under strict scrutiny, a "narrowly tailored" statute is impossible. In any event, the paradox is not presented here. The District may be able to present sufficient evidence to explain why the contradictions and under- and over-inclusiveness do not matter. For now, the Act is impaled on unexplained evidence suggesting that seventeen-year-olds are committing a large percentage of juvenile crime and that much crime involving juveniles occurs before 8 p.m. The Act would do virtually nothing to address these law violations. Although well-crafted defenses may minimize

the intrusive effect of a curfew regime, see Qutb, 11 F.3d at 493–95, the statistical and other data deficiencies going to the heart of the District's curfew regime force the conclusion that the Act may be over-inclusive despite the ameliorative effect of its defenses.

Given the deficiencies in key evidence before the D.C. Council and the district court, the Act does not survive intermediate scrutiny as it affects minor appellees' equal protection and due process rights.[33] This is not to say that the D.C. Council is precluded from relying on the experiences of other cities in formulating curfew policy choices, cf. Renton, 475 U.S. at 51–52, 106 S.Ct. at 930–31, or that it must produce "scientifically certain criteria of legislation," Ginsberg, 390 U.S. at 642–43, 88 S.Ct. at 1282–83 (quoting Noble State Bank v. Haskell, 219 U.S. 104, 110, 31 S.Ct. 186, 187–88, 55 L.Ed. 112 (1911)) (internal quotation marks omitted), or that it is not to be allowed a reasonable opportunity to experiment with solutions to serious problems, see Renton, 475 U.S. at 52, 106 S.Ct. at 931. Neither is it to suggest other than that it is for the District government and not the courts to weigh alternative policies in light of supporting data. See Lalli, 439 U.S. at 274, 99 S.Ct. at 527–28. But when a statute impinges upon minors' constitutionally protected rights, there must be persuasive evidence that the problem will be addressed by the legislative solution. See Hogan, 458 U.S. at 731, 102 S.Ct. at 3339–40; Lalli, 439 U.S. at 274, 99 S.Ct. at 527–28. Otherwise, the statute has no more than a tenuous connection to the problem it seeks to address and the legislature has acted in an insufficiently reasoned fashion. Hence, notwithstanding any greater latitude afforded a legislature under an intermediate standard than under strict scrutiny, the loose ends—especially

---

the Committee on the Judiciary of the D.C. Council 1 (undated). A chart of juvenile arrest statistics provided by the Police Chief, however, indicated that there were 1,466 "part I" offenses committed by juveniles in FY 1994 *during curfew hours alone.* See Letter from Fred Thomas, Chief of the Metropolitan Police Department, to William P. Lightfoot, Councilmember-At-Large of the D.C. Council 6 (Mar. 22, 1995). As the district court aptly noted, the District has not

explained this "mathematical impossibility." Hutchins, 942 F.Supp. at 677–78.

**32.** See, e.g., Nunez, 114 F.3d at 940 & n. 2; Qutb, 11 F.3d at 493–94; McCollester v. City of Keene, 586 F.Supp. 1381, 1385 (D.N.H.1984).

**33.** Consequently, there is no need to reach appellees' other contentions.

those relating to the age group that is most often victimized or arrested, and the time and place most juvenile crime and victimization occurs—leave a court to speculate that the curfew regime would likely achieve its goals. Intermediate scrutiny requires more.

Accordingly, in light of Judge Tatel's concurrence in the judgment upon concluding that the Act fails to survive strict scrutiny, we affirm the judgment of the district court holding the Act unconstitutional.

818

## ATTACHMENT
## APPENDIX

**ENROLLED ORIGINAL**

Codification

District of Columbia Code

[____1996____ Supplement]

AN ACT

New
Chapter 21A.
Title 6

D.C. ACT 11-90

IN THE COUNCIL OF THE DISTRICT OF COLUMBIA

JULY 6, 1995

To establish a curfew for juveniles under the age of 17 years in the District of Columbia, to provide for parental responsibility for implementation of the act, to provide for exceptions to the act and to amend the District of Columbia Traffic Act of 1925 to impose driving restrictions on minors.

BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA, That this act may be cited as the "Juvenile Curfew Act of 1995".

Sec. 2. Findings and purpose.

New Section
6-2181

(a) The Council of the District of Columbia ("Council") has determined that there has been an increase in juvenile violence, juvenile gang activity, and crime by persons under the age of 17 years in the District of Columbia.

(b) The Council has determined that persons under the age of 17 years are particularly susceptible, because of their lack of maturity and experience, to participate in unlawful and gang-related activities and to be the victims of older perpetrators of crime.

(c) The Council has an obligation to provide for the protection of minors from each other and from other persons, for the enforcement of parental control over, and responsibility for, children, for the protection of the general public, and for the reduction of the incidence of juvenile criminal activities.

(d) The Council has determined that a curfew for those under the age of 17 years will be in the interest of the public health, safety, and general welfare and will help to attain these objectives and to diminish the undesirable impact of this conduct on the citizens of the District of Columbia.

(e) The Council determines that passage of a curfew law will protect the welfare of minors by:

■

District of Columbia Register

ENROLLED ORIGINAL

(1) Reducing the likelihood that minors will be the victims of criminal acts during the curfew hours;

(2) Reducing the likelihood that minors will become involved in criminal acts or exposed to narcotics trafficking during the curfew hours; and

(3) Aiding parents or guardians in carrying out their responsibility to exercise reasonable supervision of minors entrusted to their care.

Sec. 3. Definitions.                                                          New Section
                                                                             6-2182
For the purposes of this act, the term:

(1) "Curfew hours" means from 11:00 p.m. on any Sunday, Monday, Tuesday, Wednesday, or Thursday, until 6:00 a.m. on the following day, and from 12:01 a.m. until 6:00 a.m. on any Saturday or Sunday. During the months of July and August, the term "curfew hours" means from 12:01 a.m. until 6:00 a.m.

(2) "Emergency" means an unforeseen combination of circumstances or the resulting state that calls for immediate action. The term "emergency" includes, but is not limited to, a fire, a natural disaster, an automobile accident, or any situation that requires immediate action to prevent serious bodily injury or loss of life.

(3) "Establishment" means any privately-owned place of business operated for a profit to which the public is invited, including, but not limited to, any place of amusement or entertainment.

(4) "Guardian" means a person who, under court order, is the guardian of the person of a minor or a public or private agency with whom a minor has been placed by a court.

(5) "Minor" means any person under the age of 17 years, but does not include a judicially emancipated minor or a married minor.

(6) "Narcotic trafficking" means the act of engaging in any prohibited activity related to narcotic drugs or controlled substances as defined in the District of Columbia Uniform Controlled Substances Act of 1981, effective August 5, 1981 (D.C. Law 4-29; D.C. Code § 33-501 *et seq.*).

(7) "Operator" means any individual, firm, association, partnership, or corporation that operates, manages, or conducts any establishment. The term "operator" includes the members or partners of an association or partnership and the officers of a corporation.

(8) "Parent" means a natural parent, adoptive parent or step-parent, or any person who has legal custody by court order or marriage, or any person not less than 21 years of age who is authorized by the natural parent, adoptive parent, step-parent or custodial parent of a child to be a caretaker for the child.

(9) "Public place" means any place to which the public, or a substantial group of the public, has access, and includes, but is not limited to, streets, highways, and the common areas of schools, hospitals, apartment houses, office buildings, transport facilities, and shops.

(10) "Remain" means to linger or stay or fail to leave the premises when requested to do so by a police officer or the owner, operator, or other person in control of the

■

### ENROLLED ORIGINAL

premises.

(11) "Serious bodily injury" means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

Sec. 4. Curfew authority; defenses; enforcement and penalties.     New Section 6-2183

(a)(1) A minor commits an offense if he or she remains in any public place or on the premises of any establishment within the District of Columbia during curfew hours.

(2) A parent or guardian of a minor commits an offense if he or she knowingly permits, or by insufficient control allows, the minor to remain in any public place or on the premises of any establishment within the District of Columbia during curfew hours.

(3) The owner, operator, or any employee of an establishment commits an offense if he or she knowingly allows a minor to remain upon the premises of the establishment during curfew hours.

(b)(1) It is a defense to prosecution under this act that the minor was:

(A) Accompanied by the minor's parent or guardian;

(B) On an errand at the direction of the minor's parent or guardian, without any detour or stop;

(C) In a motor vehicle, train, or bus involved in interstate travel;

(D) Engaged in an employment activity pursuant to An Act To regulate the employment of minors within the District of Columbia, approved May 29, 1928 (45 Stat. 998; D.C. Code § 36-501 *et seq.*), or going to, or returning home from, an employment activity, without any detour or stop;

(E) Involved in an emergency;

(F) On the sidewalk that abuts the minor's residence or that abuts the residence of a next-door neighbor if the neighbor did not complain to the Metropolitan Police Department about the minor's presence;

(G) In attendance at an official school, religious, or other recreational activity sponsored by the District of Columbia, a civic organization, or another similar entity that takes responsibility for the minor, or going to, or returning home from, without any detour or stop, an official school, religious, or other recreational activity supervised by adults and sponsored by the District of Columbia, a civic organization, or another similar entity that takes responsibility for the minor; or

(H) Exercising First Amendment rights protected by the United States Constitution, including free exercise of religion, freedom of speech, and the right of assembly.

(2) It is a defense to prosecution under subsection (a)(3) of this section that the owner, operator, or employee of an establishment promptly notified the Metropolitan Police Department that a minor was present on the premises of the establishment during curfew hours

■

ENROLLED ORIGINAL

and refused to leave.

(c)(1) Before taking any enforcement action under this section, a police officer shall ask the apparent offender's age and reason for being in the public place. The officer shall not issue a citation or make an arrest under this section unless the officer reasonably believes that an offense has occurred and that, based on any response and other circumstances, no defense in subsection (b) of this section is proferred or is present.

(2) If a police officer determines that a minor is committing a curfew offense, the police officer shall take the minor to the nearest available Police District headquarters or substation or other area designated by the Metropolitan Police Department.

(3) A minor who violates this act shall be detained by the Metropolitan Police Department at the nearest available Police District headquarters or substation or other area designated by the Metropolitan Police Department and released into the custody of the minor's parent, guardian, or an adult person acting in loco parentis. The minor's parent or an adult person acting in loco parentis with respect to the minor shall be called to the Police District headquarters or substation or other designated area to take custody of the minor. A minor who is released to a person acting in loco parentis with respect to the minor shall not be taken into custody for violation of this act while returning home with the person acting in loco parentis. If no one claims responsibility for the minor, the minor may be taken to the minor's residence or placed in the custody of the appropriate official at the Family Services Administration of the Department of Human Services and, subsequently, released at 6:00 a.m. the following morning.

(d)(1) Any adult who violates a provision of this act is guilty of a separate offense for each day, or part of a day, during which the violation is committed, continued, or permitted. Each offense, upon conviction, is punishable by a fine not to exceed $500 or community service.

(2) Parents or persons in loco parentis of the minor may, upon each conviction for violating this act, be required to complete parenting classes pursuant to the Prevention of Child Abuse and Neglect Act of 1977, effective September 23, 1977 (D.C. Law 2-22; D.C. Code § 6-2101 *et seq.*) or title 16 of the District of Columbia Code.

(3) When required by section 16-2302, charges brought under this act shall be transferred to the Family Division of the Superior Court of the District of Columbia.

(4) A minor adjudicated of a violation of this act by the Family Division of the Superior Court may be ordered to perform community service of up to 25 hours for each violation.

(e)(1) The Mayor shall report to the Council, not less than 90 days prior to the expiration of this act, on the curfew's effectiveness and shall recommend that the curfew either be continued or discontinued.

(2) The Mayor shall include the following in the report required by this subsection:

(A) The number of minors detained and the number of persons fined as a result of a violation of this act;

(B) The number of criminal homicides and other narcotic trafficking

■

ENROLLED ORIGINAL

related crimes of violence committed during the time that this act is in effect by age of persons involved and by time of day;

(C) The number of minors injured during the curfew hours as a result of crime and the cause of each injury; and

(D) The District's net cost of enforcing the ordinance.

Sec. 5. Driving restrictions for minors.

Section 7 of the District of Columbia Traffic Act of 1925, approved March 3, 1925 (43 Stat. 1121; D.C. Code § 40-301), is amended by adding a new subsection (g) to read as follows:

"(g) No person under the age of 18 who has a valid District of Columbia drivers license shall operate a motor vehicle in the District of Columbia after midnight, except as provided in section 4 of the Juvenile Curfew Act of 1995. Violation of this section is punishable by the suspension of driving privileges for a period not to exceed 1 year.".

Sec. 6. (a) This act shall take effect after a 30-day period of Congressional review following approval by the Mayor (or in the event of veto by the Mayor, action by the Council of the District of Columbia to override the veto) as provided in section 602(c)(1) of the District of Columbia Self-Government and Governmental Reorganization Act, approved December 24, 1973 (87 Stat. 813; D.C. Code § 1-233(c)(1)), and publication in either the District of Columbia Register, the District of Columbia Statutes-at-Large, or the District of Columbia Municipal Regulations.

(b) This act shall expire 2 years after its effective date.

Chairman
Council of the District of Columbia

Mayor
District of Columbia
APPROVED: July 6, 1995

*Codification
District of
Columbia
Code
1999 Supp.*

AN ACT

D.C. ACT 12-331

IN THE COUNCIL OF THE DISTRICT OF COLUMBIA

APRIL 20, 1998

To amend the Juvenile Curfew Act of 1995 to repeal the sunset provision.

BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA, That this act may be cited as the "Juvenile Curfew Amendment Act of 1998".

Sec. 2. Section 6(b) of the Juvenile Curfew Act of 1995, effective September 20, 1995 (D.C. Law 11-48; 42 DCR 3627), is repealed.

**Note, Sections
6-2181 -
6-2183**

Sec. 3. The Council adopts the fiscal impact statement in the committee report as the fiscal impact statement required by section 602(c)(3) of the District of Columbia Home Rule Act, approved December 24, 1973 (87 Stat. 813; D.C. Code § 1-233(c)(3)).

Sec.4. This act shall take effect following approval by the Mayor (or in the event of veto by the Mayor, action by the Council to override the veto), approval by the Financial Responsibility and Management Assistance Authority as provided in section 203(a) of the District of Columbia Financial Responsibility and Management Assistance Act of 1995, approved April 17, 1995 (109 Stat. 116; D.C. Code § 47-392.3(a)), a 30-day period of Congressional review as provided in section 602(c)(1) of the District of Columbia Home Rule

Act, approved December 24, 1973 (87 Stat. 813; D.C. Code § 1-233(c)(1)), and publication in the District of Columbia Register.

Chairman
Council of the District of Columbia

Mayor
District of Columbia

APPROVED: April 20, 1998

TATEL, Circuit Judge, concurring in the judgment:

The Supreme Court has long recognized that juveniles' constitutional rights can be as robust as adults'. *See Reno v. Flores,* 507 U.S. 292, 315–16, 113 S.Ct. 1439, 1454–55, 123 L.Ed.2d 1 (1993) (children have core liberty interest no narrower than that of adults in remaining free from institutional confinement) (O'Connor, J., concurring); *Tinker v. Des Moines Indep. Community Sch. Dist.,* 393 U.S. 503, 506, 511, 89 S.Ct. 733, 739, 21 L.Ed.2d 731 (1969) ("Students in school as well as out ... are possessed of fundamental rights which the State must respect...."); *In re Gault,* 387 U.S. 1, 13, 36–37, 55–57, 87 S.Ct. 1428, 1448–49, 1458–59, 18 L.Ed.2d 527 (1967) (finding no material differences between juvenile and adult rights to counsel and against self-incrimination); *Brown v. Board of Educ.,* 347 U.S. 483, 493–95, 74 S.Ct. 686, 691–92, 98 L.Ed. 873 (1954) (applying same equal protection standards to African American children as to adults). The Court has also recognized that society has legitimate reasons for limiting the constitutional rights of juveniles. *See Carey v. Population Servs. Int'l,* 431 U.S. 678, 693 & n. 15, 97 S.Ct. 2010, 2020 & n. 15, 52 L.Ed.2d 675 (1977) (plurality opinion of Brennan, J.) (sustaining ban on sale of contraceptives to minors because of "the States' greater latitude to regulate the conduct of children, and because the right to privacy implicated here is the interest in independence in making certain kinds of important decisions" (quotation marks and citations omitted)); *Ginsberg v. New York,* 390 U.S. 629, 636–37, 88 S.Ct. 1274, 1278–79, 20 L.Ed.2d 195 (1968) (permitting state to adjust its definition of obscenity as applied to minors); *Kent v. United States,* 383 U.S. 541, 555, 86 S.Ct. 1045, 1054, 16 L.Ed.2d 84 (1966) (juveniles tried in juvenile court system lack right to jury trial). A majority of Justices, however, has yet to agree on a rule governing the level of judicial scrutiny applicable to juvenile constitutional rights, leaving circuit courts to devise approaches consistent with the Supreme Court's various pluralities, the need to protect juvenile constitutional rights, and the commonsense understanding that the state can regulate children more intrusively than adults.

Judge Rogers' thoughtful opinion strikes the balance between juvenile constitutional rights and society's authority over minors by employing intermediate scrutiny. Although this approach has intuitive appeal—it acknowledges the real differences between children and adults—I fear that intermediate scrutiny risks reducing protection for juvenile rights more than necessary to accommodate society's special interest in and authority over children. Requiring only a "substantial" relationship between legislative means and ends, *Plyler v. Doe,* 457 U.S. 202, 218, 102 S.Ct. 2382, 2395, 72 L.Ed.2d 786 (1982), intermediate scrutiny normally applies where less than full-fledged constitutional protection is warranted. *See id.* at 223–24, 102 S.Ct. at 2397–98 (no fundamental right at stake); *see also Turner Broad. Sys., Inc. v. FCC,* 520 U.S. 180, 117 S.Ct. 1174, 1189, 137 L.Ed.2d 369 (1997) (content-neutral regulation of speech warrants only intermediate scrutiny protection); *Kahn v. Shevin,* 416 U.S. 351, 355, 94 S.Ct. 1734, 1737, 40 L.Ed.2d 189 (1974) (upholding gender-based property tax exemption because it rested on a "reasonable distinction" between widows and widowers). The District's curfew, however, directly burdens a fundamental constitutional right—the right to freedom of movement. *See Kolender v. Lawson,* 461 U.S. 352, 358, 103 S.Ct. 1855, 1858–59, 75 L.Ed.2d 903 (1983) (stop-and-identify statute "implicates consideration of the constitutional right to freedom of movement").

My colleagues rest their respective positions on the proposition that minors are "always in some form of custody," Rogers Op. at 808 and Silberman Dissent at 828 (both quoting *Flores,* 507 U.S. at 302, 113 S.Ct. at 1447 (quoting *Schall v. Martin,* 467 U.S. 253, 265, 104 S.Ct. 2403, 2410, 81 L.Ed.2d 207 (1984))). While this is obviously true in schools and other juvenile institutions, *see Vernonia Sch. Dist. 47J v. Acton,* 515 U.S. 646, 654, 115 S.Ct. 2386, 2391, 132 L.Ed.2d 564 (1995); *Flores,* 507 U.S. at 302, 113 S.Ct. at 1447, the curfew applies to all minors out after 11:00 p.m. The state has no custody over these minors, nor has parental supervision necessarily failed, *cf. Schall,* 467 U.S. at 265, 104 S.Ct. at 2410. In this circumstance,

the juvenile right to freedom of movement is at its most robust. To be sure, the District may be able to articulate a compelling interest in controlling the movement of juveniles, but that neither abrogates nor weakens the fundamental right. *See Flores*, 507 U.S. at 315–16, 113 S.Ct. at 1454–55 (O'Connor, J., concurring). This was Justice Powell's message in *Bellotti v. Baird*: "[C]hildren generally are protected by the same constitutional guarantees against governmental deprivations as are adults [but] the State is entitled to adjust its legal system to account for children's vulnerability and [ ] needs...." 443 U.S. 622, 635, 99 S.Ct. 3035, 3044, 61 L.Ed.2d 797 (1979) (plurality opinion of Powell, J.).

Because fundamental rights are at stake in this case, I would apply strict scrutiny. *See Nunez v. City of San Diego*, 114 F.3d 935, 946–49 (9th Cir.1997) (rejecting intermediate scrutiny and striking down juvenile curfew under strict scrutiny). Strict scrutiny accommodates the government's legitimate need to regulate minors—in *Bellotti*'s words, to "adjust its legal system to account for children's vulnerability and [ ] needs," 443 U.S. at 635, 99 S.Ct. at 3044—by recognizing that legislatures may have compelling reasons to limit fundamental juvenile freedoms in situations where adults could never be restricted. In this case, evidence of serious juvenile crime and victimization furnishes a compelling interest in heightened protection for minors, possibly even in the form of a juvenile curfew.

While thus accommodating the state's need to regulate juveniles, strict scrutiny's requirement that "presumptively invidious" laws, *Plyler*, 457 U.S. at 216–17, 102 S.Ct. at 2394–95, be necessary, narrowly tailored, and the least restrictive means of achieving their result, *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 237–38, 115 S.Ct. 2097, 2117–18, 132 L.Ed.2d 158 (1995), ensures the demanding level of judicial review necessary to protect fundamental rights. Unlike intermediate scrutiny's lighter standard, strict scrutiny's searching inquiry requires that legislatures carefully and rigorously craft suspect laws to ensure that they limit fundamental rights no more than necessary to accomplish compelling goals. Notwithstanding the city's compelling interest in reducing juvenile crime and victimization, because the curfew implicates fundamental constitutional rights, the District has no legitimate reason to adopt a constitutionally suspect law that is only substantially related to its ends (intermediate scrutiny), rather than the least restrictive means of accomplishing those ends (strict scrutiny), merely because the objects of that law happen to be under eighteen.

The differences between strict and intermediate scrutiny have concrete consequences. For example, because the District relies on evidence from Dallas, San Antonio, and New Orleans to limit the constitutional rights of its own citizens, I think it should be required to demonstrate (strict scrutiny), not just reasonably assume (intermediate scrutiny), why the experiences of those cities are relevant to Washington, D.C. *Compare City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 505, 109 S.Ct. 706, 727–28, 102 L.Ed.2d 854 (1989) (under strict scrutiny, Richmond City Council could not rely on evidence of discrimination in other jurisdictions to support local set-aside), *with City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 51–52, 106 S.Ct. 925, 930–31, 89 L.Ed.2d 29 (1986) (under intermediate scrutiny, Renton could use evidence from Seattle regarding effects of adult theaters as long as the data was "reasonably believed to be relevant"). Otherwise, the District may limit the fundamental rights of its juvenile residents more than necessary to protect them. Likewise, while I agree with Judge Rogers that the curfew is not substantially related to its ends (intermediate scrutiny), strict scrutiny would require the District to meet the heavier burden of demonstrating that the curfew is a less restrictive, more effective means of reducing juvenile crime and victimization than other alternatives, such as after-school programs. Strict scrutiny would require the District actually to consider alternative means for protecting juveniles. Nothing in the record indicates that the City Council did so before promulgating the curfew. Far from requiring "scientific certainty," Rogers Op. at 809, these strict scrutiny inquiries merely ensure that the City Council acts with great care when fundamental rights are at stake.

Applying intermediate scrutiny has implications beyond the rights of juveniles subject to the curfew. The curfew also infringes parents' rights to raise children free from state interference, rights undoubtedly entitled to strict scrutiny. *See Pierce v. Society of Sisters,* 268 U.S. 510, 534–35, 45 S.Ct. 571, 573–74, 69 L.Ed. 1070 (1925) (public school education requirement infringed parental right to direct children's upbringing and education); *see also Reno v. American Civil Liberties Union,* — U.S. —, 117 S.Ct. 2329, 2341, 2348, 138 L.Ed.2d 874 (1997) (striking down Internet indecency ban in part because it did not permit parents to authorize their children to access banned material). Testing the curfew under intermediate scrutiny, moreover, opens the door to legislative infringement of other juvenile constitutional rights. Would it mean, for example, that a law limiting juvenile participation in midnight vigils in front of the White House need only be substantially related to some important governmental interest? What about a law curtailing interstate travel by juveniles? In such cases, I think strict scrutiny more effectively reconciles the state's interests with the fundamental rights of juveniles.

I write separately for a second reason. Under either strict or intermediate scrutiny, the way in which the D.C. City Council converted the curfew from a temporary emergency measure into permanent law further demonstrates its unconstitutionality. As originally enacted, the curfew contained a sunset provision under which it would have expired on September 20, 1997, just twelve days after oral argument in this case. Responding to our inquiry about the possibility of mootness and using its emergency legislative authority, the City Council excised the sunset provision. *See* D.C. Council Res. 12–452 (Apr. 7, 1998) ("The Council adopted emergency and temporary legislation in order to prevent the Court of Appeals from declining to decide the appeal on mootness grounds."). The Council did subsequently accept additional materials into the record from a curfew supporter, but those materials consisted of nothing more than excerpts from the original record in this case, some updated crime and victimization statistics, and several articles on curfews. When the Council then permanently repealed the sunset provision, moreover, it explained that its purpose was legislative convenience. *See* D.C. COUNCIL COMM. ON THE JUDICIARY REPORT at 2 (Feb. 25, 1998) ("Permanent legislation is necessary at this point in order to avoid having to use temporary, gap-filling measures as the Council has done thus far."). The District thus created a permanent curfew not because the Council determined that juvenile crime and victimization required one, but in order to avoid mooting this litigation and the legislative inconvenience of passing temporary measures. I doubt anyone would suggest that mootness and inconvenience amount to substantial, much less compelling, governmental interests that could ever justify limiting a fundamental constitutional right.

Deleting the sunset provision undermined the curfew's constitutionality in other ways. Not only was the original curfew ordinance temporary, but it directed the Mayor to produce a report ninety days prior to its expiration detailing the number of minors detained, "[t]he number of criminal homicides and other [sic] narcotic trafficking related crimes of violence" by age and time of day, and the number of minors injured during curfew hours as a result of crime, D.C.CODE ANN. § 6–2183(e) (Supp.1997), precisely the sort of information needed to determine whether the curfew is narrowly tailored or even substantially related to its purposes, or what changes might make it so. These provisions demonstrated that even with the curfew's many defects, *see* Rogers' Op. at 812–14, the City Council was at least willing to reevaluate its continuing need, a critical element of both strict and intermediate scrutiny. *See Adarand,* 515 U.S. at 238, 115 S.Ct. at 2118 (quoting *Fullilove v. Klutznick,* 448 U.S. 448, 513, 100 S.Ct. 2758, 2792–93, 65 L.Ed.2d 902 (1980) (Powell, J., concurring)). But when the District made the curfew permanent without demonstrating the need for permanence, it not only further loosened the fit between its means and ends, but it also denied itself the information it would need to fashion a curfew that might pass constitutional muster.

SILBERMAN, Circuit Judge, dissenting:

Because I do not read either Supreme Court precedent or the history and tradition of this country as giving minors a fundamental right to be unaccompanied on the streets at night, I would apply rational basis review and uphold the curfew. The Supreme Court has instructed that " '[s]ubstantive due process' analysis must begin with a careful description of the asserted right, for '[t]he doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field.' " *Reno v. Flores,* 507 U.S. 292, 302, 113 S.Ct. 1439, 1447, 123 L.Ed.2d 1 (1993) (quoting *Collins v. Harker Heights,* 503 U.S. 115, 125, 112 S.Ct. 1061, 1068–69, 117 L.Ed.2d 261 (1992)). Appellees have described the right at stake as "the fundamental right to free movement." But this puts it at too high a level of generality. The basic definition of the word "liberty," from which our due process rights emanate, is "freedom from physical restraint." To some degree, then, the "freedom to move" must be included in our fundamental rights. It does not follow, however, that "movement" itself is the operative right. Such a broad assertion would lead to somewhat ridiculous results—for example, installing a traffic light would trigger strict scrutiny. *See Townes v. City of St. Louis,* 949 F.Supp. 731 (E.D.Mo.1996), *aff'd.* 112 F.3d 514 (8th Cir.), *cert. denied* —— U.S. ——, 118 S.Ct. 235, 139 L.Ed.2d 166 (1997) (applying heightened scrutiny when resident claimed that city's placement of large flower pots across the entry to her block infringed her fundamental right to intrastate travel); *Lutz v. City of York,* 899 F.2d 255 (3d Cir. 1990) (applying strict scrutiny to "cruising" ordinance, which prohibited repeatedly driving around loop of certain major roads). And despite appellees' assertion that the Supreme Court has recognized such a right, the Court has not been so clear. To be sure, in cases dealing with travel interstate and abroad, the Court has suggested in dicta that a "right to movement" may exist. *Kent v. Dulles,* 357 U.S. 116, 126–27, 78 S.Ct. 1113, 1118–19, 2 L.Ed.2d 1204 (1958); *United States v. Wheeler,* 254 U.S. 281, 41 S.Ct. 133, 65 L.Ed. 270(1920). The Court's discussion is in the context of crossing borders, however, which seems a different matter than un-limited access to the streets. Appellee also cites cases holding vagrancy statutes void for vagueness; although the Court does at one point quote from Walt Whitman's "Song of the Open Road," the legal analysis in these cases did not deal with a liberty interest at all. *Papachristou v. City of Jacksonville,* 405 U.S. 156, 164, 92 S.Ct. 839, 844, 31 L.Ed.2d 110 (1972); *see Kolender v. Lawson,* 461 U.S. 352, 358, 103 S.Ct. 1855, 1858–59, 75 L.Ed.2d 903 (1983).

I am thus left to define the interest as it appears in the case before me, mindful that substantive due process encompasses only those rights deeply rooted in the history and tradition of our society. *Michael H. v. Gerald D.,* 491 U.S. 110, 122, 109 S.Ct. 2333, 2341–42, 105 L.Ed.2d 91 (1989) (plurality opinion). While appellees frame their interest as "freedom of movement," I think that the appropriate articulation is "the right of minors to be unaccompanied on the streets at night." I am aware of no such tradition, and, if anything, Supreme Court precedent cuts against the start of one. When a group of juvenile aliens detained before a deportation hearing challenged INS regulations allowing them to be released only to certain adults, the Court said that their claimed fundamental right surely could not be "a right to come and go at will, since, as have said elsewhere, 'juveniles, unlike adults, are always in some form of custody.' " *Reno v. Flores,* 507 U.S. at 302, 113 S.Ct. at 1447 (quoting *Schall v. Martin,* 467 U.S. 253, 265, 104 S.Ct. 2403, 2410, 81 L.Ed.2d 207 (1984)). If children are "always in some form of custody," it is anomalous to say that they have a "fundamental right to be unaccompanied." The Supreme Court has jealously guarded its prerogative to be the promulgator of new fundamental rights, and since it has not gone this far, neither would I.